

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,377

**DONALD ANDREW BESS, JR., Appellant**

**v.**

**THE STATE OF TEXAS**

**ON DIRECT APPEAL FROM CAUSE NO. F10-00056-L
IN THE CRIMINAL DISTRICT COURT NO. 5
DALLAS COUNTY**

HERVEY, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, PRICE, JOHNSON, KEASLER, COCHRAN, and ALCALA, JJ., joined. WOMACK, J., concurred.

## O P I N I O N

Appellant, Donald Andrew Bess, was convicted in June 2010 of capital murder for the sexual assault and murder of Angela Samota. TEX. PENAL CODE § 19.03(a)(2). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.0711, Sections 3(b) and 3(e), the trial judge sentenced Appellant to

death. TEX. CODE CRIM. PROC. Art. 37.0711, § 3(g).[1] Direct appeal to this Court is automatic. Art. 37.0711, § 3(j). Appellant raises fifty-two points of error. We will affirm.

## I. Facts

Because Appellant challenges the legal sufficiency of the evidence that led to his conviction, we review the facts of the case in detail. At the time of her death, Samota was a junior at Southern Methodist University (SMU). She was majoring in electrical engineering and computer science while working part-time at Texas Instruments.

Samota was dating Ben McCall, who worked in construction and lived in Dallas while managing a project for his company. McCall testified that his relationship with Samota was exclusive and comfortable, that there was very little tension in their relationship, and that whenever their busy schedules allowed, they would spend all of their free time together. Samota's friend Ana Kadala testified that Samota thought McCall was the "cat's meow." Thomas Geantil, Samota's step-brother, testified that McCall was "significant" and he believed that McCall "might be the one."

On Friday, October 12, 1984, Samota went out with two friends, Kadala and Russell Buchanan. Kadala testified that Samota wore a black silk jumpsuit with black pumps. McCall testified that Samota had invited him to go with them, but he declined because he had to work early the next morning. Samota drove Kadala and Buchanan in her car to Bennigan's and then to Studebaker's, a nightclub. Kadala and McCall both

---

[1]Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

testified that, at some point in the evening, Samota called McCall and asked him to meet her at the Rio Room, a club with a members-only backroom. He declined again. McCall testified that he arranged for Samota, Kadala, and Buchanan to get in the Rio Room using his membership. However, David Skelton, an employee of the Rio Room, testified that Samota got into the club because she knew him through business. He also stated that there was not a call from McCall that night asking him to let Samota into the club.

After leaving the Rio Room, Samota and Kadala dropped Buchanan off at his apartment. Buchanan testified that this was between 1:00 and 1:30 a.m. Samota and Kadala then drove to Samota's apartment in order to pick up Kadala's curling iron. Kadala had originally planned to spend the night with Samota but decided not to do so because Samota was leaving for a football game too early the next morning. Consequently, Samota drove Kadala to her dorm and dropped her off. Kadala testified that she arrived at her dorm room sometime between 12:45 p.m. and 1:30 a.m. Buchanan, Kadala, and Skelton all testified that Samota did not appear to be intoxicated. They were all comfortable with her driving and believed that she had the full use of her mental and physical faculties.[2]

According to McCall, at 1:30 a.m., a knock on his front door woke him up; it was Samota on her way home. McCall stated that he knew the time because he had looked at his clock as he rolled over in bed. McCall testified that he conversed with Samota for two

---

[2]Testing during the autopsy revealed that Samota's blood-alcohol concentration was .09.

minutes. Samota had stopped by "to rub in" the fact that he had work early the next morning, and McCall described the conversation as "playful-type teasing."

McCall further testified that, about fifteen minutes after she left, at 1:45 a.m., McCall received a phone call from Samota, and he testified that she was acting strange. For example, the first thing that she said was, "Talk to me"; their conversation was disjointed; Samota seemed nervous and was rambling; and he could hear noises in the background. McCall twice asked her what the noises were, and Samota eventually explained that she had let a man into her condominium to use the bathroom and telephone. A few moments later, McCall heard Samota tell someone, "Oh, the bathroom's down the hall." After talking some more, Samota asked McCall if there was a pay phone at a nearby convenience store, and he answered, "I'm sure there is." Samota relayed that information to the man in her condo, but McCall did not hear if the man responded. At that point, Samota told him that she would call him back and hung up the phone.

McCall testified that he became concerned when Samota never called back. McCall called her several times, and when she did not answer, he drove to her condo. He testified that, during the eight to ten minutes it took him to drive there, he called Samota repeatedly with the cellular phone in his truck but failed to reach her. When McCall arrived and saw Samota's car, he ran to her front door located on the second floor of the condominium building and knocked, but she did not answer. Discovering the front door locked, McCall ran to the back door, but it was also locked. He called Samota's phone

again and could hear it ringing in the kitchen. McCall stated that when he heard no other sound from Samota's apartment, he drove to the convenience store they had discussed earlier. Samota was not there, so McCall returned to her apartment. At 2:17 a.m., he called the police to report the unusual activity.

Officers Ken Budjenska and Janice Crowther took the call and met McCall in the parking lot of Samota's complex at 2:40 a.m. McCall told the officers that Samota had gone out that night with friends and that, after returning home, she called him and was acting strange. He also informed the officers that Samota had let a man into her condo to use her restroom and phone, and that after calling McCall, she had abruptly hung up and did not answer her phone. Budjenska testified that, after knocking on Samota's door, and because there were no apparent exigent circumstances, he directed Crowther to obtain a key to Samota's apartment from the property manager. Using that key, the officers entered the condo through the front door. McCall waited at the door for the officers to investigate.

Budjenska testified that one of the first things that he noticed upon entering the condo was a single black pump on the floor, and this "quickened [his] pulse" because he did not know anybody who takes off just one shoe and leaves it there. Crowther searched the kitchen but found no signs of Samota. At the same time, Budjenska continued to the bedrooms, and he discovered Samota's body in the second bedroom. She was naked, covered in blood, and lying face up with her eyes open; the lower half of her body was

hanging off the end of the bed. Budjenska checked for a pulse and found none. He testified that he remembered the scene "like it was last week" because, unlike other assaults and murders he had worked, this crime "looked like it was the result of . . . evil preying on innocence." Budjenska then continued his search of the condo in case the attacker was still present. In doing so, he discovered "a smudge of blood on the light switch," blood on the shower curtain, and "some residue of blood in the bathtub, where it looked like somebody had washed some blood off."

Once satisfied that the attacker was no longer at the scene, Budjenska told Crowther about his discovery of Samota's body, and he radioed headquarters and called for an ambulance. Meanwhile, Crowther went to the bedroom. She testified that Samota's body looked angelic, "like a young person that I could relate to." She also testified that Samota's eyes were wide open and that she still remembered Samota's blue eyes to this day. When asked about the wounds suffered by Samota, Crowther stated that "[i]t appeared that her heart had been cut out."

Budjenska went back to the front door and told McCall that he had found Samota. Budjenska testified that when McCall received the news, he started to take a step to go to her bedroom, but Budjenska stopped him. Budjenska and Crowther testified that McCall was then extremely quiet but cooperative.

When the ambulance arrived, the paramedics confirmed that Samota was dead. An employee of the Medical Examiner's Office, Michael Darst, also arrived and confirmed

that Samota was deceased. Others responding to the report of a murder included members of the physical evidence section (PES) of the Dallas Police Department and Homicide Detectives Virgil Sparks and Russell Graves.

## A. Crime scene evidence

Detective Sparks testified that there were no signs of forced entry: the back door was dead-bolted, the front door had been locked, and the sliding glass door was intact and locked. Sparks testified that, as far as he knew, McCall did not have a set of keys to the condo at all, and McCall testified to the same. Sparks further stated that he could not remember the locking mechanism on the front door, but he acknowledged that it could have been the kind of lock that locks automatically or with just a turn of the nob when the door is shut. Sparks also explained that he investigated the possibility that an individual could climb the tree by Samota's porch and then enter through the sliding glass door. He testified that he was able to lift the sliding glass door off of its track to open it, but he was not sure how someone would get it back on the track if in a hurry.

Inside, Sparks noted that a knife was missing from Samota's kitchen knife set, and another detective, Linda Crum, testified that the murder weapon was never found. Samota's telephone was on the kitchen counter, and Michael Darst of the Medical Examiner's Office testified that it "appeared that the telephone had been wiped clean."[3] On the counter next to the telephone, a necklace was on top of Samota's black purse, and

---

[3]Linda Crum testified that the phone records for Samota and McCall's telephones were never obtained.

a set of keys was nearby. Sparks also noted that there was a black scuff mark next to the black pump in the front of the condo that he noticed because it "was the only scuff mark or soil spot on the whole carpet area." The other shoe was located in the bedroom near a pile of clothes by the bed, but the clothes were not ripped and had no blood on them.

Billy Shehee, a member of PES, testified that they were able to lift comparable-latent prints from the hall bathroom, a drinking glass on the coffee table in the living room, a dry-cleaning bag on the bed next to Samota's body, and the lid of the toilet in the bathroom next to Samota's bedroom. None of the comparable prints were bloody, and analysis revealed that all of the fingerprints were Samota's, except for the one palm print on the toilet lid that was never identified. Shehee explained that it was not unusual to have fingerprints that cannot be matched, particularly because there is no way of knowing how long they have been there. Shehee also testified that bloodstains and smudges were found low on the shower curtain, the bathroom's light switch, and the wall just below the light switch, but no comparable prints were lifted from those areas.

David Spence, a supervisor at the Dallas County crime lab, testified that blood was found in the bathtub's drain, and the blood droplets found in the tub appeared to have been deposited while the tub was wet. Similarly, Spence stated that blood found on the kitchen counter was diluted, which was consistent with someone touching the counter after washing his bloodstained hands. Detectives Sparks and Crum testified that no foreign hairs were found on the bedding, clothing, or body.

Spence examined photographs of the crime scene and the autopsy as an expert witness for the State. Based on this examination, he performed a blood-pattern analysis, and he stated that he could draw multiple conclusions from the photographs. Spence explained that the headboard of Samota's bed had an upward "cast-off trail" of blood beginning at Samota's head and reaching to the top of the headboard. He also noted that there were additional blood spatters on the side of the bed going to the wall and that there were numerous "void areas" where no blood was present. Spence stated that the headboard spatters were typical of a back stroke and that, when a person is stabbing someone with a knife and quickly raises that knife, "droplets of blood would fling off the blade of the knife."

Spence further testified that there were "contact transfers" on Samota's body "where a bloody object transferred blood from the object onto [her] body." He also found transfer blood stains on both of Samota's thighs—he testified that the upper left thigh stain was consistent with a bloody right hand while the transfer stain on her right thigh was consistent with a fingerprint or thumb print.[4] Samota had transfer stains on her right chin area and upper torso as well, and Spence testified that the stain near her mouth could have been the result of someone's bloody hand.

Consequently, Spence opined that the attacker was right-handed, was swinging the knife quickly, and was probably on the bed, facing the victim, when he repeatedly stabbed

---

[4]No comparable print could be lifted from the bloody prints on Samota's thighs.

her. In addition, he concluded that the lack of blood in certain areas was consistent with the attacker's body being on top of Samota and blocking the transfer of blood to those areas. Finally, because of the size of the void areas, he could determine that the assailant was probably a fairly large individual.

Dr. M.G.F. Gilliland of the Dallas County Medical Examiner's Office performed Samota's autopsy, which began approximately twelve hours after Samota was killed. Starting with an exterior examination of the body, Gilliland noticed the blood stains and void areas about which other witnesses testified, and she agreed that something had blocked the blood from staining the clean parts of Samota's body. She also concluded that, based on the blood on Samota's face, it appeared that a hand had covered her mouth.

After cleaning the blood stains, Gilliland found a cut in the web of Samota's left thumb, a small scratch across the back of her left hand, and superficial cuts on her right hand, all indicative of defensive wounds "made when a victim tries to ward off blows by the attacker." Samota had been stabbed in her chest eighteen times. Based on an internal examination, Gilliland concluded that at least two of the eighteen stab wounds penetrated Samota's sternum, something that would require significant force. In addition, all eighteen of the stab wounds penetrated Samota's left lung and eight penetrated her heart, one of which entered and exited her heart. Gilliland also noted that, based on the stab wounds, it appeared that the murder weapon was an instrument sharp on one side and blunt on the other and that it was approximately two to four inches in length, of which all

are consistent with a knife.

Gilliland testified that she also examined the body for signs of a sexual assault. She found no external injuries to Samota's mouth, genitalia, or anus. However, she did find viscous secretions or "gooey globs" in the mouth and vagina. A sexual assault kit was used to preserve the evidence, and the kit was sent to the crime lab for analysis, which confirmed that the secretion in Samota's vagina was semen. Gilliland explained that the viscous secretions discovered in Samota would not be found in a healthy female because semen breaks down from its own enzymes and from the natural reaction in a live woman's vagina. "This takes place in a fairly-short time: Under an hour." Moreover, consistent with the blood-spatter patterns and the fact that the semen was still in her vagina and had not drained out, Gilliland concluded that Samota had not moved after the intercourse and that she was stabbed while lying down. She opined that, based on the crime scene, it appeared that the sexual intercourse was nonconsensual. She recognized the lack of external injuries to the mouth, genitalia, and anus, but explained that "[i]t is not necessary to have injuries in order to define nonconsensual sexual intercourse." This is in part due to the body's natural secretions, which allow lubrication. In sum, Gilliland concluded that Samota had intercourse at or near the time of death, that is "the victim either had had intercourse first and then a violent attack or [a] violent attack and the intercourse was done after death."

Sarah Williams, a forensic serologist, analyzed the rape-kit evidence. After testing,

Williams concluded that Samota had Type B blood and that she was a secretor.[5] She also found that, while Samota's oral and anal swabs and smears contained no semen, her vaginal swab tested positive for acid phosphatase, a chemical found in high levels in seminal fluid. Based on that, Williams concluded that seminal fluid was present.

Williams testified that the vaginal smear was "loaded" with intact spermatozoa, which led her to the conclusion that the sample was as it would be if taken almost at the time of intercourse. She also explained that the strong levels of acid phosphatase in the vaginal smear meant that the source of it was seminal fluid and not vaginal fluid. Williams stated that she would not expect these types of results—fully loaded with intact sperm and high levels of acid phosphatase—in living victims unless they were examined immediately after intercourse because deterioration begins within three hours and gravity will eventually eliminate the liquid. Moreover, if Samota had moved around after the sexual intercourse, Williams would not have seen the quantity of fluid she found, or even any at all.

Dr. Claudia Werner, an obstetrician and gynecologist, testified as an expert witness for the State. She stated that she had performed between 200 and 400 sexual assault examinations of victims who had walked into an emergency room after being sexually assaulted. Werner testified that, in the vast majority of those cases, the patients examined

---

[5]Williams testified that a "secretor" is someone who carries his blood type in bodily fluids other than blood. Thus, a secretor's blood type could be determined from vaginal fluids, eye secretions, or other non-blood bodily fluids.

had no signs of external injuries, and she had seen severe genital trauma in only about ten or twenty of the examinations. In addition, Werner explained that she had seen vaginal smear samples loaded with intact spermatozoa from women who had sexual intercourse within an hour or two of coming to the hospital, but she would not expect to find such a sample four to six hours after intercourse. Werner further explained that ejaculate is initially a viscous congealed secretion called coagulum and that it liquefies quickly in a vagina—"At most, 20 minutes, probably in an intact, living person." Werner said that, due to gravity and the fact that sperm liquefies quickly, she rarely saw secretions in a woman's vagina. She also testified that "[t]he pelvic floor is and the tissues outside the vagina are mostly muscle. So as you move around, walk, breathe, whatever, those muscles -- everything sort of causes an outward draining of the vagina."

Dr. James Traylor, a forensic pathologist, testified as an expert witness for the defense, and he disagreed with certain conclusions drawn by Gilliland, Williams, and Werner. Specifically, he did not believe that there was sufficient information to conclude either that Samota's death and the sexual intercourse were contemporaneous or that the sexual intercourse was nonconsensual. Traylor recognized that on average, the viscous secretions will liquify in fifteen to twenty minutes. However, he stated that intact sperm can survive twenty-four to seventy-two hours in a living person. And he believed that the viscosity in this case was more likely due to cervical mucous being present than the viscosity of the ejaculate. Moreover, he testified that the high level of acid phosphatase

was *not* indicative of the fact that sexual activity was close in proximity to death. Therefore, in his opinion, the intact spermatozoa simply indicated that Samota had sexual intercourse within twenty-four hours of her death, and absent anogenital trauma or semen on the bedding (none was found), Traylor believed that there was inadequate data to conclude that the intercourse was nonconsensual or contemporaneous with death. Nonetheless, on cross-examination, Traylor acknowledged that there is a possibility that Gilliland's conclusions were correct.

### B. The police investigation

The police investigation initially focused on four persons of interest: Ben McCall, Russell Buchanan, Lance Johnson, and Joseph Barlow. McCall was interviewed hours after the murder, and at that time, he provided a written statement, consented to a search of his truck and apartment, gave blood and saliva samples, and agreed to a scraping of his fingernails. No blood or hair was detected in McCall's fingernail scrapings. A comparison of his blood and saliva samples to that of the rape kit eliminated McCall as a suspect based on his blood type, and no items of evidentiary value were recovered from the search of McCall's truck and apartment.

Police had trouble locating Russell Buchanan, and as a result, they became suspicious of him. But it was later confirmed that he had attended a wedding at the Dallas Country Club and then flew to Houston. Buchanan testified that he returned to Dallas on Sunday, October 14, and he became aware of Samota's death when numerous police

officers with guns drawn knocked on his door. Buchanan stated that, after he was interviewed and provided a statement, he was questioned by the police "over and over again." Buchanan eventually retained an attorney, and the police stopped questioning Buchanan. Still, Buchanan voluntarily provided blood and saliva samples, but because he was a non-secretor, he could not be excluded as the contributor of the semen.

Lance Johnson, one of Samota's former boyfriends, was also eliminated as a suspect. Sparks testified that, although Johnson had admitted to threatening Samota with a knife once before, it was confirmed that Johnson was asleep at his parent's house in Amarillo at the time of the crime. In addition, testing verified that Johnson was not a contributor to the semen in the rape kit.

Police also investigated Joseph Patrick Barlow, a student at SMU. Sparks testified that Barlow reportedly had a crush on Samota, and in his statement to police, Buchanan recalled that Samota had received harassing notes from "Patrick." Although Barlow could not be excluded as the source of the seminal fluid in the rape kit because he was a nonsecretor, Sparks testified that he was eliminated as a suspect because his whereabouts elsewhere at the time of the offenses were confirmed.

Michael Darst, the field agent at the scene for the Dallas County Medical Examiner, testified that his report contained a note about a sheet of paper found in Samota's trash can. Samota had written that she had a date with somebody other than her current boyfriend, and her current boyfriend was very jealous about the situation.

Detective Sparks testified that he had no recollection of such a note, and there was no evidence that the note was collected by PES officers or that any other witnesses had heard of or seen such a note.

The police continued to investigate by identifying individuals who had worked on Samota's vehicle, workers who had installed Samota's carpet in her condo, and the maintenance and landscaping crews who worked at the complex. In addition, the police investigated individuals previously arrested for rape who were not incarcerated at the time of the crime, and their fingerprints were compared to those obtained at the crime scene.

The police eventually exhausted all of their leads, and the case was suspended pending new information. The case remained cold for almost twenty-three years until Samota's former roommate contacted cold-case detective Linda Crum in July of 2006. Following their conversation, Crum contacted the Dallas County crime lab, which confirmed that it still possessed the vaginal swab procured by Gilliland and the jumpsuit worn by Samota on the night of the murder that had a seminal stain in the crotch area. At that point, for reasons not reflected in the record, Crum testified that she developed Appellant as a suspect.

Crum obtained a picture of Appellant as he appeared around the relevant time frame (1984-1985), when he was thirty-six years old, about six feet tall, and between 250 and 260 pounds. Using that photograph and evidence gathered from the Dallas Police Department's initial investigation, on April 15, 2008, Crum and her partner discovered

that Appellant was an inmate in Institutional Division of the Texas Department of Criminal Justice (TDCJ). The detectives Mirandized Appellant and interviewed him for about an hour. Crum testified that initially Appellant was "arrogant" and "just kind of sitting back." But his demeanor changed "abruptly" when he was told the date of Samota's murder. Appellant agreed to give a written statement:

> I got out of prison on parole in March of 1984. During that summer, I went to Dallas to visit some friends. Over the next several months, I visited Dallas 3 or 4 times. At the time, I was living and working in Houston. During my visits to Dallas I met two or three women. Mostly I would meet them at a bar in the Oaklawn Area. One lady was from California and was in Dallas for a fooseball tournament. I went with her to a hotel in Irving and we had sex. Another lady I met. I went with her to Granbury, I think, and we spent the weekend there. *I remember another girl that I met at a bar but I don't remember anything about her.* I have never hurt anyone. Most of the rest of 1984, I stayed home in Houston and worked. During sex with any girl, I have never been violent.

(Emphasis added.)

Prior to making contact, the police had obtained a search warrant for a buccal swab. Appellant's buccal swab was sent to SWIFS for DNA analysis. SWIFS also conducted DNA testing on the vaginal swab obtained during Samota's autopsy and on the swabbings of Samota's fingernail clippings. The lab was able to extract DNA profiles from the vaginal swab, and analysis of the swab taken confirmed that Appellant's DNA matched that of the seminal fluids in the rape kit to a degree of 1 in 2.69 quadrillion. Only partial DNA profiles were extracted from the fingernail clippings.[6] On May 5, 2008, the

---

[6]According to the lab's analysis report, the DNA obtained from the right-hand sample was of "degraded quality." Still, testing revealed that it was from a single female, and the "set of

day that DNA results identified Appellant as the contributor of the sperm, capital murder charges were filed against Appellant.

Shortly thereafter, Crum spoke with trace-evidence analyst David Spence and the prosecutor. They decided to test other evidence for potential DNA, including the top sheet and fitted sheet of the bed and blood samples from the kitchen counter and bathtub. A day or two later, the defense requested that the clothing that Samota wore on the day of her murder be tested also, and Crum took those items to the lab.

A full DNA profile could not be obtained from the sheets or the blood stains on the kitchen counter and bathtub. No blood or seminal stains were found on Samota's pantyhose, panties, or bra, but a semen stain was found in the crotch area of her jumpsuit. The lab was unable to extract a DNA profile from that semen stain. However, additional testing showed that Appellant could be excluded as a possible source, but McCall was included as a possible source. Crum testified that she knew that McCall and Samota were sexually active. Crum explained that there was no way of knowing when the stain was deposited on the jumpsuit, but she believed that the stains were not deposited on the night of the murders because the unstained panties and pantyhose (both found in the pile of clothes with the jumpsuit next to the bed) would have been between Samota's body and

---

genetic markers could not have originated from Donald Bess and was also observed in the mixture of DNA obtained from the epithelial cell fraction of" Samota's vaginal swab. As for the left-hand sample, the DNA was of "low quantity." The DNA profile consisted of the X-chromosome gender marker, but "[d]ue to the low quantity of DNA detected, it could not be determined with certainty if the DNA originated from a male or female; therefore, no conclusions will be made in regard to the source(s) of the DNA detected."

the jumpsuit.

## II. Sufficiency of the evidence

In point of error twenty-two, Appellant challenges the sufficiency of the evidence at the guilt phase of his trial. Evidence is legally sufficient to support a conviction if, after assessing all the evidence in the light most favorable to the verdict, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979). We review all of the evidence, whether it was properly or improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct and circumstantial evidence are equally probative, and circumstantial evidence alone can be sufficient to establish guilt. *Id.*; *Patrick v. State*, 906 S.W.2d 481, 488 (Tex. Crim. App. 1995). The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses. *Jackson*, 443 U.S. at 319. When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination. *Id.*

In this case, to prove the essential elements of capital murder, the State had to prove that Appellant intentionally caused the death of Samota in the course of committing, or attempting to commit, aggravated sexual assault. TEX. PENAL CODE §§ 19.03(a)(2) and 22.021 (defining aggravated sexual assault). Appellant argues that the murder must have "occurred in order to facilitate the aggravated sexual assault" and that the State failed to prove such a nexus between the murder and the aggravated sexual

assault. However, the only connection required is that the murder must occur "in the course of" the aggravated sexual assault, that is, in an attempt to commit, during the commission of, or in immediate flight after the attempt or commission of the aggravated sexual assault. *See Riles v. State*, 595 S.W.2d 858, 862 (Tex. Crim. App. 1980); *see also* TEX. PENAL CODE § 29.01(1) (defining "in the course of committing theft").

Here, the issues of whether the sexual intercourse between Samota and Appellant was (1) nonconsensual and (2) contemporaneous with the murder were hotly contested at trial, and the State and the defense presented conflicting testimony as to those issues. Nonetheless, the record supports a rational finding that Appellant murdered Samota during the course of aggravated sexual assault.

Gilliland testified that she believed that "death occurred at or near the time of" intercourse and that the intercourse had been nonconsensual. Gilliland explained that she found viscous secretion in Samota's vagina, and DNA results identified Appellant as the contributor of the sperm. Gilliland believed that the secretion had been recently deposited because it had not liquefied or drained from the vaginal vault. Serologist Williams also testified that, because the secretion sample was loaded with intact sperm and contained high levels of acid phosphatase, she deduced that the sample collected at the autopsy was "taken pretty much at the time of intercourse." Dr. Werner, an OB/GYN, testified that large numbers of intact sperm and its viscosity would not be found several hours after intercourse in a living person because seminal fluid and sperm begin to break down and

drain from the body shortly after intercourse. Finally, Traylor acknowledged that there is a possibility that Gilliland's conclusions were correct.

Further, evidence was presented that Samota was involved in a struggle. One of Samota's shoes was found by itself on the living-room floor with a scuff mark next to it, which Officer Budjenska testified gave him concern. Samota's clothing (including her pantsuit, bra, panties, and pantyhose) and the mate to the shoe in the living room were found in a pile in the bedroom. Moreover, autopsy results revealed that Samota had defensive wounds on her hands. Additionally, based upon the blood spatter pattern, Spence opined that the attacker was on the bed, facing the victim when he stabbed her—the lack of blood in certain areas was consistent with the attacker's body being on top of or straddling Samota. Also, bloody fingerprints found on both of Samota's upper thighs suggested that she was being held down, and blood smears on her face indicated that a hand had covered her mouth. A kitchen knife was missing from the scene, and the stab wounds on Samota's chest were consistent with wounds caused by a knife.

At the time the crime scene photos were taken, the blood on Samota's body was still liquid. Gilliland testified that this indicated that the victim had been recently murdered. Additionally, the time line of events supports the finding that the sexual assault and the murder occurred contemporaneously. Buchanan arrived at her dorm room between 12:45 and 1:30 a.m. after she was dropped off by Samota. McCall testified that Samota knocked on his front door at 1:30 a.m. and that he then spoke with her on the

phone at 1:45 a.m. When Samota did not call back or answer her phone, McCall drove over to her apartment (a drive that took between eight and ten minutes). McCall called the police at 2:17 a.m. This leaves only approximately thirty minutes during which Samota's activities are unaccounted for and during which the sexual assault and murder must have occurred.

Having viewed the evidence in the light most favorable to the verdict, we hold that the evidence is sufficient to support Appellant's conviction. The jury was able to assess the credibility and demeanor of the witnesses who testified at trial, and the verdict reflects that the jury determined from the evidence that Appellant murdered Samota and did so in the course of sexually assaulting her. *See Jackson*, 443 U.S. at 317.

Appellant argues that the evidence is insufficient because it does not foreclose the possibility that he had sex with Samota at some other time and that another individual is the real murderer. This argument is misguided because "[i]t is the State's burden to prove each element of the offense beyond a reasonable doubt, not to exclude every conceivable alternative to a defendant's guilt." *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012) (citing *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993) (explaining that "the evidence is not rendered insufficient simply because appellant presented a different version of the events")). Appellant also argues that McCall was a non-credible witness and his testimony should be discredited. Appellant asserts that McCall fabricated the time line of events, and according to Appellant, if McCall's story about visiting him before

returning home and her subsequent call was fabricated, that created an opportunity for him to murder her. But we defer to the jury as the sole judge of credibility and weight to be attached to the testimony of witnesses. *Jackson*, 443 U.S. at 319. Furthermore, as to both of these arguments from Appellant, expert testimony about the condition and amount of semen places the intercourse at the time of her death. The jury rationally convicted Appellant of capital murder based on the evidence adduced at trial. Point of error twenty-two is overruled.

### III. *Batson* challenge

In point of error number one, Appellant asserts that the State used one of its peremptory strikes to excuse panel member Margaret Austin from the venire panel because of her race, in violation of his right to equal protection under the law. Specifically, he alleges that the answers given by Austin were similar to answers given by non-minority jurors.

In *Batson v. Kentucky*, 476 U.S. 79, 86 (1986), the Supreme Court held that the State violates the Equal Protection Clause when it excludes a venire-panel member based on race. *See* Art. 35.261(a); *see also Powers v. Ohio*, 499 U.S. 400 (1991) (eliminating the requirement that the defendant and panel member struck must be the same race). A challenge to the State's use of a peremptory strike under *Batson* has three steps. First, a prima facie case of discrimination must be established by the opponent of the strike. *Nieto*

*v. State*, 365 S.W.3d 673, 675-76 (Tex. Crim. App. 2012).[7] Second, the State must produce a facially non-discriminatory reason for its use of the strike. *Id.* at 675. Third, the opponent of the strike must show purposeful discrimination by the State. *Id.* Whether the proponent of the strike intended to discriminate on the basis of race is a question of fact. *Hernandez v. New York*, 500 U.S. 352, 367 (1991). The focus of the *Batson* inquiry is on the genuineness, not reasonableness, of the asserted nonracial motive. *Nieto*, 365 S.W.3d at 676.

On appeal, we defer to the ruling of the trial court because it is in the best position to make determinations of credibility and evaluations of demeanor. *Id.* We review the entire record from voir dire and are not limited to the specific arguments made to the trial court by the parties. *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008). The ruling of the trial court will be sustained unless it was clearly erroneous. *Id.* at 447-48.

Appellant argues that he has shown intentional discrimination via a comparative juror analysis. A comparative juror analysis compares the responses of a struck panel member to the responses of other panelists with similar characteristics who were not struck. *See generally Miller–El v. Dretke*, 545 U.S. 231 (2005). If the reasons asserted by the State for eliminating a minority panel member apply equally well to non-minority members who were not struck, there is some evidence of intentional discrimination based

---

[7] If the State does not challenge that prima facie case, we will not review whether Appellant established a prima facie case. *Wheatfall v. State*, 882 S.W.2d 829, 835 (Tex. Crim. App. 1994).

on race. However, if the answers of the minority panel members are materially distinguishable from those selected to serve, then no intentional discrimination is shown. A comparative juror analysis is only one of numerous non-exclusive factors used to show intentional discrimination, so a successful showing of disparity does not necessarily result in a finding of purposeful discrimination. *See Watkins*, 245 S.W.3d at 449.

At trial, and citing the jury questionnaire, the State argued that it struck Austin because it generally did not accept panel members who were a "five" on the death-penalty scale, who thought the death penalty is used too often, or who had a problem judging others in a death penalty case. The State also noted that Austin had issues with Dallas County and the criminal justice system in general, she believed that too many people are in prison unfairly, and her demeanor was not favorable because she seemed "put out" when answering questions from the State. On appeal, Appellant argues that, because some of Austin's answers were similar to those of other panel members accepted by the State, he has proved intentional discrimination.

To begin, Austin rated herself a "5"on the questionnaire when required to rate her view on punishment from one to ten (one being the lightest and ten the most severe). Although at individual voir dire Austin stated that she had ranked herself a "9," "after being shown her questionnaire, she stated that she did write a '5.'" The record reflects that of the other members accepted by the State, no one who rated themselves lower than "7" was accepted by the State.

The State's second race-neutral reason for striking Austin was that she indicated on the questionnaire that she believed the death penalty is used too often and, during individual voir dire, she reaffirmed that belief when she said that some cases called for rehabilitation, not incarceration. Austin also explained that she believed Texas has a history of convicting innocent people, which caused her to question the use of the death penalty. The State did accept one other panel member, Kathy Wylie, who believed the death penalty was used too often, but unlike Austin, Wylie clarified that the death penalty was used too often *only* if wrongly administered.

Next, the State argued that, unlike other accepted members, Austin had negative feelings regarding the criminal justice system in general and specifically in Dallas County. Austin had a negative reaction when asked about her prior jury service. She explained that the prosecution "had a play gun as evidence. And [she] did not like that. They let - somebody took the gun out of evidence." She initially denied that the trial was a bad experience for her but subsequently stated, without further explanation, that *one* of the things that she disliked about her prior jury service was that other jurors complained about having to serve. Regarding the criminal justice system more generally, Austin indicated on the questionnaire that she did not like to judge other people, although she later explained, "That's all I could come up with that day." Austin also indicated a belief that too many people are in prison unfairly; "[A] lot of criminals are victims of society, because of being poor and don't have the advantages of others, education and all that kind

of stuff."

Appellant argues that other panel members—Khristian Kendall, Bobby Manson, and Eileen Corrigan—who were accepted by the State, shared Austin's belief that there were people unfairly imprisoned. Those panel members appeared similarly situated in that they all expressed concern that an innocent or wrongfully convicted person could be put to death. But a comparison of their answers to Austin's concerns—she had a negative opinion of Dallas County and the criminal justice system in general—show that Austin's complaints were much different. While Austin believed that the criminal justice system had systemic problems, the accepted members were confident in the system and they did not think that criminals were victims of society or that too many people were unfairly imprisoned.

Finally, the State cited Austin's demeanor—she seemed "put out" answering questions as a reason for striking her. Appellant states in his brief that Austin's "flat personality" was not a reaction to the State's question but was due to the fact that she was an Internal Revenue Service agent. We rely on the ruling of the trial court, particularly when the question turns on the credibility and demeanor of a witness, and we will defer to the trial court's ruling.

After reviewing the voir dire record for clear error, we cannot conclude that Austin was similarly situated to other non-minority panel members accepted by the State. The race-neutral reasons propounded by the State are supported in the record, and Appellant's

after-the-fact comparative juror analysis does not persuade us that the trial court was clearly erroneous in overruling Appellant's *Batson* challenge. Point of error number one is overruled.

## IV. Challenges for cause

In points of error two through fifteen, Appellant argues that the trial court erred when it denied his challenges for cause against fourteen specific panel members.

A panel member who is biased or prejudiced against the defendant or against the relevant law can be challenged for cause if that "bias or prejudice would substantially impair [his] ability to carry out his oath and instructions in accordance with the law." *Gonzales v. State*, 353 S.W.3d 826, 831 (Tex. Crim. App. 2011); *see also* Art. 35.16(b)(3), (c)(2); *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). To properly challenge a panel member for prejudice against the law, the movant must show that the relevant law was explained to the venireperson and that he understood the requirements of that law, but could not sufficiently overcome his prejudice to follow the law, even when asked to do so. *Gonzales*, 353 S.W.3d at 832; *Jones v. State*, 982 S.W.2d 386, 390 (Tex. Crim. App. 1998).

On appeal, a reviewing court will overturn the trial court's ruling on a challenge for cause only if it clearly abused its discretion. *Gonzales*, 353 S.W.3d at 831. We examine the entire record of voir dire, and because proper assessment of a challenge for cause requires observation of a panel member's demeanor, we defer to the conclusions of

the trial court, especially when a juror vacillates. *Id.* The issue on appeal is whether the ruling of the trial court harmed Appellant by "effectively depriving him of one of his statutorily allotted peremptory challenges." *Id.* A defendant is wrongfully deprived of a challenge (and thereby harmed)

> (1) when a defendant exercises a peremptory challenge on a veniremember whom the trial court should have excused for cause at the defendant's request, (2) the defendant uses all of his statutorily allotted peremptory challenges, and (3) the defendant unsuccessfully requests an additional peremptory challenge which he claims he would use on another veniremember whom the defendant identifies as 'objectionable' and who sits on the jury.

*Id.* If the trial court grants an additional challenge, then the defendant is effectively deprived of an allotted challenge only if the trial court erroneously denies two defense challenges for cause. *Id.*

The record reveals that Appellant used all fifteen of his statutorily allotted peremptory strikes and that he was granted one additional strike. The trial court denied Appellant's request for a second additional strike to exercise on another juror whom he identified as objectionable, and that juror was seated on the jury. Thus, because he was granted an additional strike, to show harm Appellant must prove that the trial court erred in denying his challenges for cause to two panel members. *See Newbury v. State*, 135 S.W.3d 22, 31 (Tex. Crim. App. 2004).

## A. Individual challenges

In point of error two, Appellant argues that the trial court erroneously denied his

challenge for cause against venireperson Articia Williams because she demonstrated bias against the law. According to Appellant, she "would not give meaningful consideration to Appellant's mitigation evidence concerning age." Appellant was sixty-one years old at the time of trial.

The third special issue requires a juror to decide, "taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant," whether "there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed." *See* Art. 37.0711, § 3(e). This Court has held that because mitigating evidence is not statutorily defined, each juror must individually decide what he views as mitigating evidence. *See McFarland v. State*, 928 S.W.2d 482, 498 (Tex. Crim. App. 1996), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998). Thus, because no particular piece of evidence is per se mitigating under the law, a juror must be capable of understanding the concept of mitigating evidence and willing to consider that, in light of presented evidence, a sentence of death may not be warranted if a juror finds that evidence to be mitigating. Art. 37.0711, § 3(e); *see Saldano v. State*, 232 S.W.3d 77, 98 (Tex. Crim. App. 2007) (explaining that there is no per se mitigating evidence).

In this case, Appellant told Williams that, after finding a defendant guilty of capital murder and finding that he would be a future danger, many jurors are unable to

consider mitigating evidence because "[t]heir mind is closed off to it . . . ." When asked how she would feel in such a situation, Williams responded, in part, "I'm not going to shut my mind off. I'm a very open-minded person." She also stated, "I feel like the Third Special issue -- I feel like I can do that just fine." When asked whether she believed that older people are less likely to commit acts of violence, Williams responded that age did not make a difference to her and that she could find mitigating circumstances in a deliberate capital murder based on the defendant's upbringing, background, or state of mind.

Appellant's argument fails because Williams did not demonstrate bias as she maintained that she would keep an open mind and consider all evidence. She was not required to consider age as a mitigating factor. The trial court correctly denied Appellant's challenge for cause. Point of error two is overruled.

In point of error three, Appellant argues that panel member Irene Polito was challengeable for bias against the law because she would automatically give a death sentence to a someone guilty of capital murder involving aggravated sexual assault, she was incapable of considering certain evidence relating to future dangerousness, and no circumstances would ever be sufficiently mitigating to change her mind about assessing the death penalty. As the State avers, Appellant challenged Polito at trial only on the ground that she cannot give meaningful consideration to Appellant's mitigating evidence. Therefore, other claims are not properly before this Court, and we consider Appellant's

argument only as it relates to Polito's ability to consider mitigating evidence. *See* Tex. R. App. P. 33.1.

To support his argument, Appellant cites the following exchange during cross-examination:

> [DEFENSE COUNSEL]: Are you the type of person that -- after having found that [a crime] was an intentional, cold-blooded murder, that it was deliberate murder and that the person is a future danger, whether in prison or not, are you the type of person that's going to automatically believe that there's not anything sufficiently mitigating to warrant sparing the Defendant's life and vote "no" to that so that he gets a death sentence?
>
> [POLITO]: It would be difficult for me to -- let me rephrase that. Basically, I guess what I would say is that I would keep an open mind. But I can't say with 100 percent certainty that I wouldn't rule the death -- take the death penalty off the table. But it would be -- I'd really have to think about it.

Additionally, shortly thereafter, Polito confirmed that she could give "full and meaningful consideration to all mitigation evidence" presented. Polito also consistently reiterated that she thought the decision to sentence someone to death should be made on "an individual case-by-case" basis and that "it all depends on the case." And Polito responded affirmatively when asked, "There will be no automatic answers for you to any of these [special] . . . issues, right? You're going to wait and make both sides present all the evidence to you, and then decide." Hence, Polito was able to identify mitigating evidence, and under the proper circumstances, she could find that there was sufficient mitigating evidence to warrant a sentence less than death. Point of error three is overruled.

In point of error four, Appellant argues that Jana Carelock should have been excused when challenged for cause for the following reasons: (1) Carelock was acquainted with the lead prosecutor, (2) her parents were the victims of a violent home invasion that was successfully prosecuted, (3) she had an uncle who was kidnaped and robbed in a "car-jacking," (4) she stated during voir dire that she would convict one innocent person to prevent ten guilty people from going free, and (5) she would not consider Appellant's age or health as mitigating factors.

Appellant objected to Carelock at trial only on the grounds that she could not follow the law as it pertained to mitigation and that she would be unable to presume Appellant's innocence, so we agree with the State that Appellant's remaining claims are not properly before this court. *See* Tex. R. App. P. 33.1; *Saldano*, 232 S.W.3d at 93-94. We overrule Appellant's mitigation claim because the law did not require Carelock to give meaningful effect to any particular piece of evidence, including Appellant's age or failing health, as mitigating circumstances. *See Saldano*, 232 S.W.3d at 98.

We also overrule Appellant's claim that Carelock was unable to apply the presumption of innocence. On the jury questionnaire, Carelock disagreed with the statement, "It is better that ten guilty people go free than one innocent man be convicted." But she agreed that "[a] defendant in a criminal case is presumed innocent until the State proves their guilt beyond a reasonable doubt." The latter answer was more probative of whether Carelock could apply the presumption of innocence because it was a direct

question, rather than an indirect, philosophical question, and it is in fact the law.

Moreover, during direct examination by the State, Carelock unequivocally responded in

the affirmative when asked, "Every person is presumed innocent. It doesn't mean he's

innocent. It just means we have a job to do, and we need the jury to hold us to our burden

of proof. Can you do that?"

Also, on cross-examination, Appellant addressed the fact that Carelock went to

high school with one of the prosecutors, and when he questioned Carelock as to any

"natural bias against anybody that he would be prosecuting," Carelock stated, "I don't

think that would influence me." And when Appellant asked Carelock whether she

"absolutely can assure us that there's no problems, as far has having bias?" she

responded, "Yes. I can assure you."

Based on the record, we cannot conclude that Carelock was biased against the law

or that the trial court erroneously denied Appellant's challenge for cause. Point of error

four is overruled.

In point of error five, Appellant argues that the trial court erroneously denied his

challenge for cause to Linda Sherman. Appellant alleges that Sherman was substantially

impaired in her ability to be fair because she had a friend who was kidnaped, raped, and

murdered.  Appellant also alleges that Sherman was biased against two special issues in

that she would not follow the law as it pertains to either future dangerousness or

mitigation because she "equivocated several times in her answers and would not answer

definitively whether she could be fair."

The record reflects that the trial court acted within its discretion in finding Sherman unbiased. Sherman stated that 15 to 20 years before, a "very good family friend" was abducted, raped, and murdered. On direct examination, Sherman stated that "[i]t's possible" that her friend's murder would affect her ability to be fair and impartial, but she also stated, "I believe that I could leave that outside of here." Later, after the State explained the law and the trial process to her, Sherman affirmed that she still believed that she could stay open-minded and separate what happened to her friend from this trial. She further asserted that she could answer the special issues based solely on the evidence presented in the courtroom. On cross-examination, Sherman stated that, although she did not think that she could totally separate herself from her feelings and her past, she did not believe they would influence her decision. And at the end of its examination, the defense asked Sherman, "And even with the fact of your friend's case, you can still keep an open mind to a life sentence for someone that you believe committed a heinous murder in the course of an aggravated sexual assault?" to which Sherman responded, "Yes."

At most, Sherman's answers were equivocating. Particular deference is given to the trial court's ruling on a challenge for cause when the prospective juror's answers are vacillating, unclear, or contradictory. *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004). Sherman stated her ability to remain fair and impartial and to follow the law with sufficient conviction to justify the court's decision.

Appellant also argues that the record supports his claim that Sherman would not give meaningful consideration to the mitigation evidence. However, the record shows that Sherman was not challengeable on this basis. For example,

> [DEFENSE COUNSEL]: And 38, you said, "Unfortunately, not all people have the same advantages in life and some may be surrounded by more negative influences. Still - every person must ultimately choose right or wrong by themselves." Is that correct?
>
> [SHERMAN]: Uh-huh.
>
> [DEFENSE COUNSEL]: And that's in regard to your feelings about genetics, circumstances of birth, upbringing and environment being considered in punishment; is that correct?
>
> [SHERMAN]: Uh-huh.
>
> [DEFENSE COUNSEL]: And those answers to those questions on your questionnaire are still your feelings today?
>
> [SHERMAN]: Yes.

Sherman's answers did not indicate that she would be unable to consider mitigating evidence. Sherman repeatedly emphasized that she would not automatically answer the mitigation special issue "no." And she responded affirmatively when Appellant asked, "Can you give full consideration to all of the evidence, and if you find something sufficiently mitigating, answer the Special Issue Number Three 'yes'?" Further, Appellant asked Sherman, "Or if you find it not to be only an intentional crime but a deliberate crime and that person's a future danger, are you already going to be trying to close that window toward the death penalty? You told me you like 'eye for an eye'."

Sherman answered, "But I also believe in the presentation of evidence."

When we consider Sherman's questionnaire and the entire record of voir dire, we cannot conclude that Sherman was biased against the mitigation issue. She was willing to listen to the evidence and to consider whether, in her mind, that evidence was sufficiently mitigating to warrant a sentence less than death.

Appellant also argues that Sherman would automatically find Appellant to be a future danger. Question twelve on the jury questionnaire read, "'The death penalty is reserved for those defendants that are such a threat to society that even incarceration does not remove the probability of future violent acts.' Do you agree or disagree?" Sherman agreed and added, "Eye for eye – regardless of probability of future acts." But when we consider this in the context of the entire voir dire record, it is clear that the trial court did not abuse its discretion in determining that Sherman was not challengeable on this basis. Sherman repeatedly agreed that she could follow the law as it had been explained to her and that she should not automatically answer the special issues if Appellant was found guilty. Sherman stated that she would wait and consider all of the evidence presented at punishment before deciding her answers to any of the special issues. She also explicitly stated that she was open to the possibility of a life sentence. Point of error five is overruled.

In point of error six, Appellant contends that the trial court erroneously denied his challenge for cause against panel member Landon Birge because he would not follow the

law given to him if he did not agree it was the right thing to do or if there were "gray areas" in the law. Appellant additionally asserts that Birge would choose to incarcerate one innocent person rather than free ten guilty people, he would automatically find a person to be a future danger, and he would not consider mitigating evidence.

In his questionnaire, Birge stated that he agreed with the statement, "Regardless of what a judge says the law is, a juror should do what they believe is the right thing." However, Birge explained that he meant that he would let his conscience guide him when there was a "gray area" or "hole" in the law, recognizing that there may be issues that the law does not address. He added, "I would not just deliberately go against the Judge and go against the law."

Furthermore, once the law was explained to him and his questions were clarified, the record supports that Birge was committed to following the law. He repeatedly affirmed that he would hold the State to its burden of proving guilt beyond a reasonable doubt. Birge also stated several times that he would wait and hear all of the evidence presented before answering the special issues, particularly the issues of future dangerousness and mitigation. He emphasized that it all depends how the trial proceeds and "what is proven and not proven."

Appellant notes that Birge disagreed with the "philosophical"[8] statement that it

---

[8]During cross-examination, defense counsel twice stated that it was a philosophical question.

was better that ten guilty people go free than one innocent man be convicted, but we are not persuaded that that answer leads to the conclusion that Birge could not apply the law. The statement at issue is not meaningfully related to the specific, and more relevant question, of whether Birge would apply the law in this case. When concrete questions were asked, Birge's position was clear—he would follow the law as it was explained to him by the judge and supported by the evidence. The trial court correctly denied Appellant's cause for challenge, and point of error six is overruled.

In point of error seven, Appellant contends that he was erroneously denied his challenge for cause against panel member Brandon Cauthen because he "is extremely pro law enforcement." However, the record supports the trial court's denial of this challenge for cause.

On cross-examination, Appellant asked Cauthen whether he still believed that police officers are more likely to tell the truth than other people, and Cauthen answered affirmatively. But Appellant subsequently failed to explain to Cauthen that the law required that he listen to their testimony before assessing their credibility, and Appellant failed to ask Cauthen whether he could follow that law regardless of his personal views. As a result, Appellant's challenge for cause was not proper. *Gonzales*, 353 S.W.3d at 832. We overrule point of error seven.

In point of error eight, Appellant argues that the trial court abused its discretion when it denied his challenge for cause to Deloris Pearson-Moore. He contends that

Pearson-Moore was prejudiced against the defendant and biased against the relevant law because she would not give due and full consideration to mitigation, she was biased against defense attorneys, and she thought that anyone who committed murder deserved the death penalty.

Appellant did not challenge Pearson-Moore on the ground that she was biased against defense attorneys, and Appellant failed to explain the law relating to mitigation or ask Pearson-Moore whether she could follow that law regardless of her personal beliefs. As a result, those portions of Appellant's claim are forfeited. Appellant preserved only his claim as it pertains to Pearson-Moore's answer on the jury questionnaire that anyone who committed murder deserved the death penalty.

On the jury questionnaire, Pearson-Moore indicated that she thought some murderers, perpetrators of sexual assaults, and child predators should be sentenced to death. However, Appellant asked Pearson-Moore whether she could consider the full range of punishment, five years to ninety-nine, if the State proved only murder and not capital murder—she responded that, depending on the circumstances of the case, she could consider the full range. Also, when Appellant noted that some people readily admit that they would automatically give the maximum sentence and asked Pearson-Moore again whether she could consider the full range of punishment, she maintained that she could keep an open mind to both ends of the range of punishment and everything in between. The trial court properly denied Appellant's relevant challenge for cause. We

overrule point of error eight.

In point of error nine, Appellant argues that the trial court should have granted his challenge for cause to panel member Bobby Manson, alleging that Manson could never find evidence sufficiently mitigating to warrant a life sentence and because he wanted to be on the jury. The record reveals that Appellant objected to Manson sitting on the jury only on the mitigation ground, so the issue relating to Manson's desire to be on the jury is not properly before this Court.

During direct examination, the State explained the third special issue to Manson and asked him if he could follow the law. Manson responded that he could. Then, on cross-examination, Appellant asked Manson how he felt about life imprisonment versus the death penalty, and Manson stated in relevant part,

> [I]f it was, you know, one of those -- bottom thing, it was mitigating; or if, you know, the person was not a continuing threat to society, that might, you know, in my opinion, say maybe life in prison is more warranted versus, you know, being put to death. Death is serious. Like I said, you can't take back somebody's life.

Later, Appellant asked Manson how he felt about the fact that the defense did not want a panel member who would vote for a death sentence based upon only the gruesome nature of the crime to sit on the jury. Manson responded that he was not convinced one way or the other and that he would need to hear the evidence in this case before deciding. Appellant then asked Manson if he could consider imposing a life sentence, no matter the nature of the crime alleged. Manson answered, "[I]f there's something there that mitigates

that . . . [crime], life in prison is an option then, yeah, I can do that. I just don't think that I'm automatically saying that the death penalty is where I'm going at this point. But it is an option for me."

Manson repeatedly reaffirmed that he would need to hear all of the relevant evidence in this case before he could determine whether imposition of the death sentence was warranted. Thus, the trial court did not abuse its discretion in denying Appellant's challenge for cause against Manson. We overrule point of error nine.

In point of error ten, Appellant contends that Bonnijean Leigh should have been excused for cause because her aunt's rape and murder biased her, she could not give meaningful consideration to Appellant's mitigating evidence, and she thought that the Institutional Division of the Texas Department of Criminal Justice (TDCJ) was not capable of controlling the inmates housed in state prisons.

Leigh testified that, in the 1960s, her aunt was raped and strangled with her nightgown in her Fort Worth home by a neighbor who had been released from jail three months earlier. At the time of the murder, Leigh was ten or twelve and lived in New York. The record supports the conclusion that Leigh held no unlawful bias arising from the crime as it would not affect her ability to apply the law. For example, when asked if she could render a verdict in Appellant's case based on only the facts in his trial and not consider her aunt's murder, Leigh stated, "I believe so." And on cross examination, Leigh affirmed that she would not consider the prior murder or let it affect her decision in this

case. She explained that she knew few details about the murder, and it was not an emotionally evocative memory for her because she was so young, she did not know her aunt well, and she did not return to Texas for the trial. Leigh also described her ability to separate herself from her emotions, noting that she is a rule-follower who tries to do the right thing.

The record also supports that Leigh was not challengeable on the basis that she could not give meaningful consideration to Appellant's mitigating circumstances. Leigh had no duty to give mitigating effect to any particular piece of evidence. *See Saldano*, 232 S.W.3d at 98. Her duty was to consider all the evidence presented in determining her answers, and she repeatedly stated she would do so.

Finally, Appellant contends that Leigh was challengeable because she disagreed with the questionnaire statement that "[t]he state prison system in Texas can control inmates who have been convicted of violent offenses." But the record supports that Leigh was not challengeable on that ground. Leigh explained, "I'm just not sure whether or not inmates who have been convicted of violent offenses can really be controlled." Leigh acknowledged that her opinion on the subject was just her perception, and she stated that she would be open to hearing evidence from the defense on the matter. Moreover, she repeatedly stated that she would wait and hear all evidence before making any decisions.

The trial court did not abuse its discretion when it decided that Leigh was not challengeable for cause. Point of error ten is overruled.

In point of error eleven, Appellant argues that the trial court erroneously denied his challenge for cause to Byron Conradt because Conradt would have automatically voted to assess the death penalty if Appellant was found guilty of capital murder, he would not give meaningful consideration to Appellant's mitigation evidence, and he did not believe that TDCJ could control violent offenders. At trial, Appellant challenged Conradt only on the first two grounds, so we agree with the State that he forfeited his latter claim related to TDCJ.

Conradt acknowledged that he was in favor of the death penalty. On direct examination, the State described a scenario in which the defendant had been found of guilty of committing murder during the course of an aggravated sexual assault. The State then asked, "[W]here you [sic] would you be leaning after you found that person guilty, life or death, what would you tell me?" Conradt responded, "I believe that's worthy of the death penalty." Later, on cross-examination, when asked about his personal views regarding the death penalty versus life imprisonment, Conradt explained, "It's very important, beyond a shadow of a doubt, guilty is proved, period. But after that, then I believe there's punishment. There needs to be punishment for that. The crime has been committed and, regardless of the mitigating circumstances, there needs to be punishment for that. A life for a life. . . . That's my vent [sic] going in, before I listen to any of the evidence or weight the facts."

Still, when these statements are reviewed in the context of the entire voir dire

record, it is clear that the trial court did not abuse its discretion in deciding that Conradt was not challengeable for cause. Although Conradt's personal feelings strongly supported the death penalty, he was aware that the requirements of the law under the circumstances called for consideration of three special issues, and he would openly consider those issues. Conradt explained that he could not agree completely with the statement that "the death penalty is appropriate in all murder cases." He also repeatedly affirmed that he was the type of person who can wait and listen to all of the evidence before applying the law. He recognized that it might be hard, but "[w]e have to follow those rules, and that's what the system is based on." Regarding mitigating evidence specifically, Conradt stated, "I can't think of anything . . . that might be a mitigating circumstance. But I'm certainly open to listening to that, to whatever might occur in the deliberations during that." Conradt explained, "I have [a] responsibility as a juror to do that, even though I can't comprehend what that might be at the moment. I can't process what it could be until I hear it." Conradt also clarified his view on whether the death penalty should be automatic: "I have to defer to those that have made the laws, that are smarter than myself and those kind of things, to determine what determines between a life sentence and a death sentence. We've got the three rules to follow. So that will determine my actions."

The record shows that Conradt was aware that his strong beliefs about the death penalty were at odds with the requirements of the law and that he could follow the law. We cannot conclude that the trial court abused its discretion in overruling Appellant's

challenge for cause. Point of error eleven is overruled.

In point of error twelve, Appellant asserts that panel member Harold Price should have been excused when he was challenged for cause. At trial, Appellant challenged Price for being "biased against the type of evidence [Appellant] will be using in his Defense. Especially his mitigation evidence." On appeal, Appellant's precise complaint is unclear. Appellant cites Price's statements that someone who willfully took someone's life, not in self-defense, should receive the death penalty. Appellant also argues that Price's answers did not reflect his true feelings about the law and his ability to follow it; rather, Price simply followed the State's instructions on how to answer in order to be a qualified juror. To the extent that they do not comport with his trial objections, Appellant's complaints are not properly before this Court. *See* Tex. R. App. P. 33.1.

If we consider the record, it reveals that Price was not challengeable on the alleged grounds. The record reflects that Price believed in the death penalty, but he was also open to the possibility of a life sentence and would base his answers to the special issues on the law and evidence. For example, Price agreed that "a life sentence, rather than the death penalty, would be appropriate under the proper circumstances in some cases" and he could vote for a life sentence if it were the right thing to do after hearing all of the facts. He repeatedly stated that he would wait to hear all of the evidence before he made a judgment. Additionally, Price denied that he would automatically answer the special issues in a particular way ("I have to wait until I heard everything."), and he stated, "I

don't think my personal issues would get in the way of the law." Further, the law does not require any juror to give meaningful effect to any particular piece of mitigation evidence. *See Saldano*, 232 S.W.3d at 98.

Regarding his ability to follow the law, Price's answers on both direct and cross-examination indicated his understanding and willingness to follow the law. He consistently affirmed that he could do what the law required him to do and that his personal views would not get in the way. Having had the opportunity to witness Price's demeanor and testimony, the trial court found his assurances to follow the law credible, and the record supports that determination. *See Threadgill,* 146 S.W.3d at 667.

The trial court did not abuse its discretion in denying Appellant's challenge for cause against Price. Point of error twelve is overruled.

In point of error thirteen, Appellant argues that Phillip Jones was excusable for cause because he could not presume Appellant's innocence and he would automatically find Appellant guilty of capital murder.

Both of Appellant's complaints are based on Jones's prior grand jury service. Appellant specifically focuses on the following comments by Jones when defense counsel asked him about his grand jury experience:

> . . . You know, let me say one thing. One thing that I did learn from serving as a juror and also serving on the Grand Jury that - - specifically on the Grand Jury. A lot of times you may - - you're presented evidence and until you actually get to a jury phase and you actually receive all of the information, you just get enough information just to prove the person guilty of that offense.

During direct examination by the State, Jones stated that he understood that the State bears the burden beyond a reasonable doubt to prove all of the elements alleged in the indictment. He affirmed that he would hold the State to its burden and that he would acquit Appellant if the State failed to prove any element as it was alleged in the indictment. Later, the State reviewed the presumption of innocence, and Jones answered that he would "start the defendant off with a presumption of innocence until the State does its job and proves its case." Similarly, on cross-examination, Appellant explained to Jones that "all capital murders are nasty and brutal" and that, after a jury finds a defendant guilty of capital murder, some people believe that the death penalty should be automatically assessed in such a situation. When asked how he felt about that, Jones responded, "I feel open. I think that, that's incorrect. I feel that the information has to be presented, and I do believe in innocent until proven guilty."

Therefore, upon examination of the record, we conclude that Jones understood and would apply the presumption of innocence and he would not automatically find Appellant guilty of capital murder. The trial court properly denied Appellant's challenge for cause. We overrule point of error thirteen.

In point of error fourteen, Appellant contends that the trial court erroneously denied his challenge for cause to panel member Elascor Pack because Pack would automatically vote to assess the death penalty and believed that the lengthy appellate process resulted in the death penalty being imposed too seldom.

At the beginning of his voir dire examination, Pack acknowledged to the State that he favored the death penalty. Still, although Pack believed that there are certain crimes that deserve the death penalty, he qualified that belief by adding, "If there's no mitigating circumstances." And when asked whether he could vote to sentence a defendant to life instead of death, he explained, "I'm open to the possibility. Like I said, it depends on the circumstances whether it was an extremely heinous crime or really malicious, or if it was kind of like as defensive-type thing." Later, the State asked Pack whether he could follow the law as it pertained to each special issue, and for each he responded that he could. Pack stated that he would not answer a special issue automatically and he would wait and listen to all of the evidence. Taking this all into consideration, the record supports that Pack would not automatically vote in favor of the death penalty.

In response to the questionnaire question regarding the appellate process, "Do you believe that the death penalty in Texas is used too often or too seldom?" Pack answered, "Too seldom[;] the appeal process could drag on for more than ten years." When the Appellant asked him to explain his answer, Pack responded, "I think that once someone has been convicted of a crime, that the punishment phase should be enacted as soon as possible, but it just seems like it's just too many appeals. There's a lot of time wasted and a lot of taxpayer's money spent."

Although Pack expressed these concerns with the appellate process in death penalty cases, his personal belief did not undermine his repeated affirmation that he could

follow the law as it was explained to him. Moreover, Pack's concern reflected a negative opinion about the appellate system, not Appellant personally.

For these reasons, the trial court did not abuse its discretion. Appellant has failed to show that Pack was biased against any applicable law upon which Appellant was entitled to rely. Point of error fourteen is overruled.

In point of error fifteen, Appellant challenges the trial court's denial of his challenge for cause against Paul Bureau because Bureau knew one of the assistant district attorneys and was mitigation impaired. At trial, Appellant challenged Bureau for cause, alleging only that he would not consider any mitigating evidence offered, and as a result, his other claim is not properly before this Court.

On direct examination, the State discussed each special issue separately with Bureau. He stated that he could keep an open mind and listen to all of the evidence before answering the special issues. Regarding the mitigation issue, Bureau affirmed that he understood the mitigation law as explained to him by the State. The State then asked Bureau, "And could you keep an open mind? And if you heard something that rose to the level of sufficient mitigation you could answer that question in a way so as to spare his life?" to which Bureau responded affirmatively. On cross-examination, Appellant asked Bureau if a terminal illness would affect his deliberations as it pertains to the mitigation special issue, and Bureau answered that he was not sure what he would consider a circumstance sufficient to warrant sparing a convict's life. Still, when Appellant pressed

on, Bureau said he was "willing to keep an open mind and keep looking back at all of the evidence to determine whether or not there's something sufficiently mitigating to warrant a life sentence as opposed to a death sentence." And he confirmed that he would not "brow beat" another juror into conforming to his personal view of whether evidence is mitigating.

After examining the record, we conclude that the trial court correctly denied Appellant's challenge for cause. Bureau's position was consistent throughout voir dire. Although he testified that he may not find a subsequent diagnosis of a terminal illness as mitigating, the law does not require him to find any particular piece of evidence sufficient to vote for a life sentence. *See Saldano*, 232 S.W.3d at 98. Appellant's fifteenth point of error is overruled.

After reviewing Appellant's points of error two through fifteen, we hold that Appellant was not denied the use of a statutorily provided peremptory strike because he has failed to show that the trial court erroneously denied two of his challenges for cause. *Newbury*, 135 S.W.3d at 31.

In points of error sixteen and seventeen, Appellant asserts that the trial court's denial of his challenges for cause deprived him of a lawfully constituted jury and that he suffered a violation of his rights under the state and federal constitutions, specifically his right to due process of law. But because we hold that the trial court did not err in denying Appellant's challenges for cause, Appellant suffers no harm because there was no error.

*See Johnson v. State*, 43 S.W.3d 1, 5 (Tex. Crim. App. 2001). Point of error sixteen and seventeen are overruled.

## V. Admissibility of Dr. Gilliland's testimony

In points of error eighteen and nineteen, Appellant argues that the trial court should have excluded Dr. Gilliland's expert testimony that the victim was sexually assaulted and that the sexual assault and murder occurred contemporaneously. He asserts that the admission violated the "heightened reliability" requirement of the Eighth Amendment in death penalty cases and Rule 702[9] of the Texas Rules of Evidence requiring that expert opinions be based on reliable scientific principles and methodology. *See* U.S. CONST. amend. VIII; *see also Coble v. State*, 330 S.W.3d 253, 270 (Tex. Crim. App. 2010) (citing *Nenno v. State*, 970 S.W.2d 549, 560-61 (Tex. Crim. App. 1998), *overruled on other grounds by State v. Terrazas*, 4 S.W.3d 720, 727 (Tex. Crim. App. 1999)).

Appellant forfeited any claim on appeal that his Eighth Amendment rights were violated by the admission of Gilliland's testimony because he did not object on those grounds at trial. *See* Tex. R. App. P. 33.1(a); *Leza v. State*, 351 S.W.3d 344, 358 (Tex. Crim. App. 2011); *see also Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993).

---

[9]Texas Rule of Evidence 702 provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

Appellant does not direct us to any objection made on his part at trial regarding the Eighth Amendment, and we are unable to locate one. Nor does Appellant argue that his claim should not be subject to the rules of procedural default. Accordingly, Appellant did not preserve his Eighth Amendment claim as it pertains to points of error eighteen and nineteen.

As for Appellant's related evidentiary claim, Rule 702 authorizes the admission of testimony from a witness possessing scientific, technical, or other specialized knowledge if the witness is qualified as an expert by knowledge, skill, experience, training, or education and his testimony will assist the fact finder to understand the evidence or to determine a fact in issue. Tex. R. Evid. 702. The proponent of expert testimony bears the burden of establishing its reliability by clear and convincing evidence. *Vela v. State*, 209 S.W.3d 128, 134 (Tex. Crim. App. 2006).

We must initially determine the admissibility standard applicable to the reliability of expert forensic-pathologist testimony under Rule 702. Hence, we must ascertain whether the proposed testimony concerns "hard science, "soft science," or "junk science." The distinction between "hard science" and "soft science" can be blurry, and we have hesitated to state a rigid rule defining each. *See Morris v. State*, 361 S.W.3d 649, 654-55 (Tex. Crim. App. 2011). *But see Weatherred v. State*, 15 S.W.3d 540, 542 n.5 (Tex. Crim. App. 2000) (comparing "hard sciences" and "soft sciences"). Nonetheless, "soft sciences" generally include the "social sciences or fields that are based primarily upon experience

and training as opposed to the scientific method . . . ."[10] *Nenno*, 970 S.W.2d at 561. When a witness's methodology and conclusions cannot be validated (or have been inadequately tested), the proposed testimony is characterized as "junk science." *Coble*, 330 S.W.3d at 274. We review a trial court's ruling on the admissibility of scientific expert testimony for abuse of discretion. *Weatherred*, 15 S.W.3d at 542.

Forensic pathology is certainly a science, as it has been defined as the "branch of medicine that applies the principles and knowledge of the medical sciences to problems in the field of law." DOMINICK J. DIMAIO & VINCENT J.M. DIMAIO, FORENSIC PATHOLOGY 1 (2d ed., CRC Press 2001). Although it relies on "hard science data," it frequently reaches soft science determinations. Duties of a forensic pathologist include determining the time, cause, and manner of injury or death, documenting injuries and deducing how they occurred, determining or excluding other contributory or causative factors of death, collecting evidence from the body that can be used to prove or disprove an individual's guilt or innocence and to confirm or deny the account of how the death occurred, and providing expert testimony if the case goes to trial. *See id.*

---

[10]We have applied the "soft sciences" standard to testimony in *Morris*, 361 S.W.3d at 654 (testimony by officers with specialized training regarding the conduct of child molesters); *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (eyewitness identification); *Davis v. State*, 329 S.W.3d 798, 815 (Tex. Crim. App. 2010) (experts offering opinions on Satanism), *Davis v. State*, 313 S.W.3d 317, 354 (Tex. Crim. App. 2010) (psychologists testifying about future dangerousness); *Coble*, 330 S.W.3d at 273 (forensic psychiatrists testifying about future dangerousness); *Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007) (testimony of a medical doctor about the correlation between alcohol, cocaine, and violence); and *Nenno*, 970 S.W.2d at 562 (FBI agents specializing in behavioral science testifying to future dangerousness). This list is not exhaustive.

In discussing pathology (though in other contexts), we have stated,

> [P]athology, like psychiatry, is a sub-specialty of the science of medicine. Medicine in any of its sub-specialties eludes mathematic precision, as evidenced by the need for a "second opinion" with regard to any important medical question. Causation or mechanism of death are examples of important medical questions addressed by pathologists that require more than an objective or rote determination.

*Rey*, 897 S.W.2d at 338; *see also id.* at 338 n.5. Thus, unlike hard sciences, the field of pathology (and forensic pathology), though based on ascertainable medical principles, cannot always produce discrete verifiable conclusions. Because a pathologist must interpret data and frequently cannot reach essential conclusions with mathematical precision, we hold that the admissibility standard from *Nenno* may apply to the expert testimony of a pathologist.

In *Nenno*, we explained that the relevant factors for validating expert testimony predicated on "soft sciences" include "(1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field." *See Nenno*, 970 S.W.2d at 561. The dispute here focuses on the third factor.

To show that an expert properly relies on the principles of his field, the expert's proposed testimony must be derived from the expert's "knowledge, skill, experience, training, or education . . . ." Tex. R. Evid. 702. Here, although she stated that she did not rely on a particular book or treatise, Gilliland explained that her opinions were based on

her education and over thirty years of experience as a forensic pathologist dealing with crime scene photographs, independent research, and blood spatter patterns.[11] She also explained that in developing her opinions regarding the timing and nonconsensual nature of intercourse, she relied on the secretion discovered in the victim's vaginal vault and research conducted about that secretion, the serologist's analysis of that secretion, crime scene photographs, and the blood-spatter evidence. The record is clear that Gilliland relied upon and utilized the principles in the relevant area of pathology. Accordingly, we hold that the trial court acted within its discretion in admitting Gilliland's expert testimony that Samota was sexually assaulted at or near the time of her murder. We overrule points of error eighteen and nineteen.

## VI. Admissibility of photographs

In points of error twenty and twenty-one, Appellant argues that the admission of various crime scene and autopsy photographs violated Texas Rule of Evidence 403 because any probative value was substantially outweighed by the danger of unfair prejudice and because the admission of the photographs was unnecessarily cumulative. *See* Tex. R. Evid. 403. The complained of photographs include five depicting the victim's body as it appeared at the scene from various angles and perspectives (State's Exhibits 40 and 74-77), five depicting the victim's body in the medical examiner's office (State's

---

[11]Appellant does not dispute the evidence of Gilliland's training, experience, or education.

Exhibits 60 and 66-69), and two depicting the victim's clothing piled on the bedroom floor near her body. The State counters that the photographs were necessary to explain the verbal testimony of the State's witnesses and any gruesomeness was the result of the circumstances of the crime.

Rule 403 of the Texas Rules of Evidence states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. This rule favors the admission of relevant evidence, but it also allows for the possibility that substantial considerations may require the exclusion of otherwise relevant evidence. *See Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). When reviewing the admission of photographs for error, we consider several factors including

> the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed. The availability of other means of proof and the circumstances unique to each individual case must also be considered.

*Id.* (citation omitted); *see Wyatt v. State*, 23 S.W.3d 18, 29 (Tex. Crim. App. 2000). Autopsy photographs will generally be admissible under Rule 403 unless they depict mutilation caused by the autopsy itself. *Rojas v. State*, 986 S.W.2d 241, 249 (Tex. Crim. App. 1998). On appeal, we review the admission of photographs for error under an abuse of discretion standard. *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009).

Officer Budjenska used State's Exhibit 40 to explain the position of the victim's body when he found it and checked for a pulse. Budjenska discovered the victim's body on the bed—he testified that the victim was lying face-up, covered in blood, unclothed, and with her eyes open. The photograph is gruesome, but that is due to the nature of the crime. Moreover, each photograph used by Budjenska shows a different angle and perspective of the scene. We hold that the trial court did not abuse its discretion when it admitted State's Exhibit 40. *See Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997) ("A photograph is admissible if verbal testimony as to matters depicted in the photographs is also admissible."); *see also Gallo*, 239 S.W.3d at 763.

Gilliland performed the autopsy on the victim. She used State's Exhibits 60, 66–69, and 74–79 to explain her findings and conclusions about the cause and manner of death, and other attendant circumstances of the crime. She testified that, before she did so, standard procedure required reviewing any available information including pictures of the scene as viewed by the investigator, any information obtained by investigation, and crime scene photographs.

Specifically, Gilliland used State's Exhibit 60, showing an absence of blood on the victim's face, to support her opinion that something was covering her face when she was stabbed. Gilliland relied on State's Exhibits 66–69 to show the difference between the blood smears and blood spatter on the victim's body. She explained that a blood smear is made by direct transfer (*e.g.*, the blood smears on the victim's thighs resembled

fingerprints) while blood spatter has an indirect origin. Gilliland's testimony and the photographs were relevant to support the State's theory that Appellant held down the victim while he stabbed her.

Gilliland used State's Exhibits 74 and 75 to explain that, because the blood was primarily situated near the victim, it is unlikely that the victim moved from that position once the stabbing began. Using Exhibit 76,[12] Gilliland testified that the victim died a sudden death based on the fact that her eyes were still open. She also testified that Exhibit 77 was helpful to show that, when the crime scene photographs were taken, the blood was still liquid, which indicated that the victim had been recently murdered. Finally, using Exhibits 78 and 79, Gilliland explained that the victim's clothing was taken off and dropped on the floor near the bed and that the photographs tended to support the State's theory that the victim was sexually assaulted by force and then murdered.

Each of the State's challenged exhibits were helpful to explain and support witness testimony, and they were not cumulative as they showed different angles and perspectives of the crime scene. Although the photographs were gruesome, the criminal act of stabbing someone eighteen times is gruesome by its very nature, and the introduction of photographs of the victim cannot be avoided. We cannot conclude that the probative value of these pictures was substantially outweighed by any unfair prejudice. The trial

---

[12]Trace-evidence analyst David Spence also used Exhibit 76 during his testimony to explain the patterns of blood at the crime scene and his conclusion that the absence of blood on the victim's face was significant, in light of the quantity of blood everywhere else.

court did not abuse its discretion when it admitted the photographs. Points of error twenty and twenty-one are overruled.

## VII. Lesser-included-offense instruction

In point of error twenty-three, Appellant argues that the trial court erred when it failed to instruct the jury on the lesser-included offense of aggravated sexual assault. *See* Art. 37.09. We employ a two-step analysis to determine whether a lesser-included-offense instruction must be given to the jury. *See Sweed v. State*, 351 S.W.3d 63, 67-68 (Tex. Crim. App. 2011). First, the reviewing court determines whether the lesser-included offense is included within the proof necessary to establish the offense charged. *Id.* at 68. Second, we must determine whether there is some evidence from which a rational jury could conclude that the defendant did not commit the greater crime but did commit the lesser-included offense. *Id.* The trial evidence must establish that the lesser-included offense is "a valid rational alternative to the charged offense." *Id.* (quoting *Segundo v. State*, 270 S.W.3d 79, 90-91 (Tex. Crim. App. 2008)). A reviewing court cannot consider if the evidence adduced at trial is credible, controverted, or in conflict with other evidence. *See Havard v. State*, 800 S.W.2d 195, 216 (Tex. Crim. App. 1989).

The State concedes that aggravated sexual assault is a lesser-included offense of capital murder as charged in the indictment. *See* TEX. PENAL CODE §§ 19.03(a) (capital murder), 22.021 (aggravated sexual assault). Thus, we address only the second part of the lesser-included test—whether any trial evidence supported a rational conclusion that

Appellant committed only aggravated sexual assault and not murder. *See Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998) (citing *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)).

As Appellant points out, Dr. Traylor challenged the conclusion of Gilliland (and the State's position) that Samota was contemporaneously sexually assaulted and murdered. Traylor testified that he could conclude only that the victim had sexual intercourse and had been stabbed. He could not determine when the sexual intercourse occurred in relation to the murder or whether Samota was raped. His interpretation of the evidence raised the possibility that the victim engaged in intercourse at a different time and different place than the murder and, hence, the possibility that Appellant had intercourse with Samota but did not commit murder.

However, when we consider the record as a whole, the lesser-included offense of aggravated sexual assault is not a valid rational alternative to the charged offense of murder. The time line of events supports the finding that the sexual assault and the murder occurred contemporaneously. Buchanan arrived at her dorm room between 12:45 and 1:30 a.m. after she was dropped off by Samota. McCall testified that Samota knocked on his front door at 1:30 a.m. and that he then spoke with her on the phone at 1:45 a.m. McCall called the police at 2:17 a.m. This leaves only approximately thirty minutes during which Samota's activities are unaccounted for and during which the sexual assault and murder must have occurred. No affirmative evidence supports the inference that,

within this short time period, Samota was sexually assaulted by one individual and then another individual entered the apartment, stabbed Samota eighteen times, and cleaned up after himself.

Moreover, even if the jury chose to believe that the intercourse and murder did not occur at the same time and place, it could not also rationally believe that the intercourse was nonconsensual or aggravated, both of which are required elements of the lesser crime of aggravated sexual assault. *See* TEX. PENAL CODE § 22.021. The relevant aggravating factors provided by the aggravated-sexual-assault statute require that the defendant causes serious bodily injury or attempts to cause the death of the victim; by acts or words places the victim in fear of death, serious bodily injury, or kidnapping; or by acts or words threatens to cause death, serious bodily injury, or kidnapping; or uses or exhibits a deadly weapon. *Id.* at (a)(2). In this case, to prove any of these aggravating factors, the sexual assault must be connected with the murder. The only evidence indicative of the aggravated nature of the offense at hand came from the murder and its surrounding circumstances, specifically the use of a knife.

Similarly, proof of sexual assault must include lack of consent. *Id.* at (a)(1). Again, it was only from the murder and its surrounding circumstances (specifically the use of a knife) that a lack of consent could be inferred.

Accordingly, Appellant has failed to meet the second prong of the lesser-included-offense test requiring that there be evidence establishing that Appellant was guilty of *only*

the lesser-included offense of aggravated sexual assault and not the greater offense of capital murder. Appellant's twenty-third point of error is overruled.

## VIII. Jury argument

In points of error twenty-four, twenty-five, and twenty-six, Appellant argues that statements made by the prosecutor during closing arguments at the guilt phase were improper and harmed him.

Generally, there are four proper areas of jury argument: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answers to an argument of opposing counsel, and (4) pleas for law enforcement. *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011) (citing *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008)). Improper-jury-argument error is usually non-constitutional and will be reversible only if the error affected the appellant's substantial rights. Tex. R. App. P. 44.2; *Freeman*, 340 S.W.3d at 728. To determine if an appellant's substantial rights were affected, we balance the severity of the misconduct, any curative measures, and the certainty of conviction absent the misconduct. *Freeman*, 340 S.W.3d at 728. We consider the jury argument in light of the entire record to determine if it was extreme or manifestly improper. *Brown*, 270 S.W.3d at 570 (citing *Allridge v. State*, 762 S.W.2d 146, 155 (Tex. Crim. App. 1988)).

### A. Point of error 24

In point of error 24, Appellant argues that the following statement made by the

prosecutor on rebuttal was improper jury argument:

> [STATE]: You talk about the crazy, incredulous possibilities the Defense wants you to go down. It's crazy. It's ridiculous. The time line, the scientific evidence, Dr. Gilliland said [the victim] did not get vertical, did not get up. Crime scene photographs confirm that. David Spence confirm [sic] that. Granted, their doctor [Dr. Traylor] came in and said, "No it doesn't mean anything." He told you that she had sex somewhere else, not even in her bed.
>
> [DEFENSE]: I'm going to object, Your Honor. That's a mischaracterization of the evidence, the way he talked about possibilities, the way he [is] arguing it, that he affirmatively said that.
>
> [COURT]: The jury will recall the evidence the way they see it.
>
> [DEFENSE]: Was that overruled?
>
> [COURT]: Overruled.

Specifically, Appellant alleges that the prosecutor misstated Traylor's testimony because the doctor did not rule out the possibility that intercourse occurred on the victim's bed, and he never said that the physical evidence and Gilliland's interpretation of it were meaningless.

The prosecutor's argument that "[h]e told you that she had sex somewhere else, not even in her bed," was not erroneous because it was a reasonable deduction from the evidence. The record reveals that Traylor testified that the only conclusions he could reliably make were that the victim had sexual intercourse and that she was stabbed to

death.[13] He disputed Gilliland's conclusion that the intercourse and the murder were contemporaneous. In his opinion, if the intercourse had been contemporaneous with the murder, there would have been seminal fluid on the bedsheet, and there was no such evidence here. In addition, Traylor stated that the viscous secretion in the vagina could not have been unliquified ejaculate, and that without a motility test (which was not done), the discovery of intact sperm in the secretion did not necessarily indicate recent intercourse. Traylor also declined to adopt Gilliland's conclusion that the sexual intercourse was the result of a sexual assault because there were no injuries to the victim's lips or genitals. Instead, Traylor believed that the murder was a "jealous frenzy" killing.

Further, we do not agree with Appellant that the prosecutor's closing argument alleged that "the physical evidence . . . [was] meaningless." The State's argument is better characterized as alleging that Traylor thought it was possible that the intercourse occurred somewhere other than the victim's bed and that he believed Gilliland's conclusions about the capital murder were incorrect and not supported by the evidence. Because the testimony of Traylor and Gilliland were in conflict, the State's argument that Traylor did not agree with Gilliland's conclusions was not error. Moreover, the trial court instructed

---

[13]Originally, Traylor's position was that no evidence supported the State's theory that the murder and sexual intercourse were contemporaneous, and he emphasized the neutral nature of the evidence. Later, he clarified that there would need to have been a seminal secretion on the bed sheet for him to conclude that the sex act and murder happened in the same transaction. He also emphasized that his conclusion conflicted with the State's theory.

the jury to recall the evidence as it was presented. Point of error 24 is overruled.

**B. Point of error 25**

In point of error 25, Appellant complains that the State improperly argued to the

jury during the following exchange:

[STATE]: For all those years, [Virgil Sparks] carried on this conspiracy. He came here 26 years later and told you that it was nothing. "I couldn't solve it." Because he -- I guess, he didn't want to pen [sic] it on this guy. I mean, this conspiracy -- these are things, Ladies and Gentlemen, that just don't make sense. These are the conjecture thing. These are the things Defense wants you to go down -- we call 'em "rabbit trails". **They've conceded everything** --

[DEFENSE]: I'm going to object, Your Honor. We haven't conceded everything.

[COURT]: Sustained.

[DEFENSE]: That's a misstatement of the argument.

[COURT]: Sustained.

[DEFENSE]: Ask the jury be instructed to disregard the last statement of the prosecutor.

[COURT]: Jury will disregard the last statement.

[DEFENSE]: Move for a mistrial.

[COURT]: Denied. Proceed.

[STATE]: Ladies and Gentlemen, counsel said, "We never said it wasn't consensual." So concede everything, except for the murder.

Appellant did not object to this last comment. The State continued its closing argument

and summarized the testimony and evidence supporting its case.

Appellant argues that the State's comment, "They've conceded everything . . . [,]" was an improper suggestion and an uninvited and unsubstantiated accusation of improper conduct on the part of Appellant's attorney. We disagree.

The prosecutor responded to Appellant's objection by completing his thought, which had been cut off by the objection, and thereby clarified any potential misinterpretation of his argument. The prosecutor clarified that the defense "concede[d] everything, except for the murder." Taking into account defense counsel's closing arguments, it is clear that the prosecutor's argument was a rebuttal to the following argument made by defense counsel:

> [L]et me, first, tell you that I don't remember one time anyone saying from the Defense table that we believe that [Appellant] had consensual sex with [the victim]. That was never said. And if that's what [the prosecutor] heard, that's her impression. But it definitely didn't come from me . . . and it's not my job to prove whether it was consensual or nonconsensual. It's not my job to prove how they met.

Taking into account these comments and other portions of the record, the complained of exchange can best be described as the State arguing that Appellant suggested that the sexual intercourse may have been consensual. Indeed, evidence solicited by Appellant at trial appeared to support that theory. Counsel has wide latitude in drawing inferences from the evidence if they are reasonable and offered in good faith. *See Cantu v. State*, 939 S.W.2d 627, 633 (Tex. Crim. App. 1997). Therefore, when we consider the State's jury argument in light of the entire record, we cannot conclude that it was improper. Point of error twenty-five is overruled.

## C. Point of error 26

In point of error twenty-six, Appellant argues that the State's closing argument referring to the denial of the lesser-included-offense instruction on aggravated sexual assault was improper jury argument because it misled the jury by inviting it to consider an issue outside of the jury charge.

> [STATE]: Now I want to go back even further and talk about some of the concepts that we talked about with each one of you in voir dire, when we were talking to each one of you individually. We talked about lesser-included offenses and the fact that if there was any evidence, whether credible or not, of either just an aggravated sexual assault occurring or just a murder --
>
> [DEFENSE]: I'm going to object, Your Honor. This is outside the Charge. It's irrelevant. It's not part of the jury's consideration. Misstatement of the law. This is a decision made by the court only.
>
> [COURT]: Overruled. Proceed.
>
> [STATE]: You'll notice that there are no lesser-included offenses in that Jury Charge. So what are you to consider, another concept we talked about during voir dire, is did we prove our elements of the case beyond a reasonable doubt? And the elements of the case essentially boil down to: Did this man (indicating), while in the course of aggravated sexual assault -- that is, while he was -- right before, during or after the rape of her, did he kill her?

Appellant contends that the State tried to mislead the jury in its argument concerning the legal issue of a lesser-included offense, which is a question of law for the court and not a fact issue for the jury. Appellant also argues that the State implied that the defense had asked for the lesser-included-offense instruction and was turned down because the trial court "did not believe it." *See Dunbar v. State*, 551 S.W.2d 382 (Tex.

Crim. App. 1977) (holding that, during closing arguments, a party may not refer to any belief, or non-belief, of the trial court); *Gipson v. State*, 503 S.W.2d 796 (Tex. Crim. App. 1974) (stating that it is error when the State, in its closing arguments, comments that the defense asked for a jury instruction).

The State's relevant argument was not improper. "A prosecutor may *without referring to any belief of the trial court* properly advise the jury that any relevant testimony which raises a material fact issue will cause the court to submit a charge explaining the law on that issue." *McClory v. State*, 510 S.W.2d 932, 934 (Tex. Crim. App. 1974). Such advice, as well as any "reasonable and proper explanation of the law of the case as contained in the court's charge," is a permitted jury argument. *Id.* Thus, while the inclusion of a lesser-included offense is a question for the trial judge to resolve, it is not error for the parties during closing arguments to correctly explain the law contained in the jury charge and its application. Here, until the prosecutor was interrupted by Appellant's objection, her statement of the law concerning lesser-included offenses was correct. *See Sweed v. State*, 351 S.W.3d 63, 68-69 (Tex. Crim. App. 2011). Moreover, she did not refer to an opinion of the trial court on the matter. Appellant's twenty-sixth point of error is overruled.

Having addressed each of Appellant's guilt-phase arguments, we now turn to his points of error relating to the punishment phase.

## IX. Admissibility of Dr. Vigen's testimony

In points of error twenty-seven and twenty-eight, Appellant takes issue with the trial court's denial of the defense's attempt to introduce hearsay statements via an expert witness. He argues that (1) the trial court should have allowed Dr. Mark Vigen to reveal hearsay statements made to him by prison guards because those statements formed the basis of his opinion and thus were admissible under Texas Rules of Evidence 703 and 705, and (2) the exclusion of those statements violated Appellant's right to due process of law.

At the request of defense counsel, the trial court appointed two experts to investigate Appellant's life and conduct during the 32 years[14] since his incarceration: Dr. Vigen and S.O. Woods (former classification director of TDCJ). To prepare for trial, Vigen interviewed corrections officers, prison supervisors, and wardens, and these interviews, together with those conducted by Woods, formed the basis of Vigen's expert testimony at punishment. At the punishment phase, Appellant called Vigen to the stand and asked him about hearsay statements made by TDCJ employees that had been interviewed. The State objected and cited the balancing test prescribed by Rule 705(d) of the Texas Rules of Evidence.[15] The trial court sustained the State's objection, and

---

[14]At the time of trial, Appellant had been in custody of TDCJ at various times for a total of 32 years of his life.

[15]Texas Rule of Evidence 705(d) provides, "When the underlying facts or data would be inadmissible in evidence, the court shall exclude the underlying facts or data if the danger that they will be used for a purpose other than as explanation or support for the expert's opinion outweighs their value as explanation or support or are unfairly prejudicial."

Appellant was allowed to introduce only that Vigen and Woods had interviewed two female and six male corrections officers and that all of those officers agreed that they could not remember having problems with Appellant. Vigen's proposed testimony was preserved for appellate review by a bill of exception.

### A. Texas Rule of Evidence 705(d) claim

Texas Rule of Evidence 703 allows an expert witness to base his opinions on facts and data not otherwise admissible if such information is reasonably relied upon by experts in that field in forming opinions or inferences. *See* Tex. R. Evid. 703. Under Rule 705(d), inadmissible facts or information relied on by an expert shall be excluded unless the value of that evidence to explain or support the expert's opinion outweighs the danger that the evidence would be used for other purposes. *Id.* at 705(a), (d). To properly balance the competing interests under that Rule, a court must decide if the evidence will assist the proponent to explain or support the expert's opinion[16] and whether the evidence would be used for purposes other than those intended or if it would be unfairly prejudicial. *See id.* at 705.

On appeal, we review a trial court's admissibility decision under Rule 705(d) for an abuse of discretion, and we will uphold the judgment of the trial court if its decision was correct on any theory of law applicable to the case. *See Valle*, 109 S.W.3d at 506; *Prystash v. State*, 3 S.W.3d 522, 528 (Tex. Crim. App. 1999). We rarely second guess the

---

[16]*Valle v. State*, 109 S.W.3d 500, 506 (Tex. Crim. App. 2003).

decisions of a trial judge in balancing the importance of the admissibility of evidence, especially in a situation such as this in which the record supports his ruling. After reviewing Vigen's trial testimony and Appellant's bill of exception,[17] we cannot conclude that the trial court abused its discretion when it excluded inadmissible hearsay statements that formed the basis of Vigen's expert opinion.

During his permitted testimony, Vigen opined that Appellant was not a future danger, a critical opinion. Moreover, Vigen identified the officers by name and gender and relayed their opinions of Appellant. The gender of the guards was of particular importance—Appellant was convicted of brutally sexually assaulting and murdering the victim, a female coed from SMU, and yet the female corrections officers interviewed believed that Appellant was not a future danger. Thus, although additional details, such as how long an officer had known Appellant, may have increased the credibility and probative value of the officer's statements and, in turn, the credibility of Vigen's conclusion, Appellant's need for the hearsay statements was marginal.

In addition, the opportunity for prejudice was high if the excluded testimony had been admitted. *See Valle*, 109 S.W.3d at 505-06. Admission of the complained of statements would have inappropriately shifted the focus of Vigen's testimony from his conclusion that Appellant would not be a future danger to the opinion of correction

---

[17]Dr. Vigen's excluded testimony was preserved by a bill of exception. When compared to his admitted testimony, the bill of exception provided more details as to how long each of the correction officers had known Appellant and the extent of their interaction.

officers who never appeared as witnesses in either party's case-in-chief. When the opportunity for prejudice is balanced against the Appellant's marginal need for the hearsay statements and we consider that the most probative parts of the officers' opinions were admitted into evidence, we are not persuaded the trial court abused its discretion.

## B. Due process claim

Appellant also argues that the exclusion of the hearsay statements violated his due process rights because he was denied "equal opportunity and access to investigate and discover evidence to use on the issue of future dangerousness." To support his argument, Appellant cites *Ake v. Oklahoma*, 470 U.S. 68 (1985), for the proposition that "an indigent [defendant] is entitled to 'meaningful access to justice[,]' which means that he should have 'access to the raw materials integral to the building of an effective defense' thus ensuring 'a proper functioning of the adversary process.'" *See also Rey v. State*, 897 S.W.2d 333, 339 (Tex. Crim. App. 1995); *DeFreece v. State,* 848 S.W.2d 150 (Tex. Crim. App. 1993). We agree with the State that Appellant's issue does not implicate the Supreme Court's holding in *Ake* because it is undisputed that the trial court provided the defense with resources necessary to procure expert witnesses and to assist in its investigations.

But we broadly construe Appellant's claim that he was denied equal access to allege that his right to present a defense was violated. *Cf. Strickland v. Washington*, 466 U.S. 668, 684-85 (1984) ("The Constitution guarantees a fair trial through the Due

Process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment."). Two cases guide our holding. *See Taylor v. Illinois*, 484 U.S. 400 (1988); *Anderson v. State*, 301 S.W.3d 276 (Tex. Crim. App. 2009).

In *Taylor*, the defendant failed to identify a defense witness after receiving a pre-trial discovery request from the State, and as a sanction, the trial court excluded that witness's testimony. *Taylor*, 484 U.S. at 401-02. The question presented on writ of certiorari was whether the trial court's refusal to allow the witness to testify violated the petitioner's right to procure the testimony of favorable witnesses under the Sixth Amendment. *Id.* at 402; *see* U.S. CONST. amend. VI. In discussing Appellant's equal-access claim, the Supreme Court noted that the choice to invoke the right of compulsory process as to defense witnesses lies solely with the defendant. *Taylor*, 484 U.S. at 410; *cf. Johnson v. State*, 357 S.W.3d 653, 657-58 (Tex. Crim. App. 2012). By its very nature, compulsory process "requires that its effective use be preceded by deliberate planning and affirmative conduct." *Taylor*, 484 U.S. at 653-54.

Subsequently, applying the Supreme Court's holding, we held that the right to compulsory process can be forfeited if the defendant fails to invoke it. *Anderson*, 301 S.W.3d at 280. We also recognized that, inasmuch as the right to present a defense derives from guarantees of due process, a defendant can also forfeit that right if he fails to insist on its implementation. *Id.*

In this case, the defense secured court orders allowing it to interview relevant

employees of TDC and to view personnel records of the prison. Using the records,

Appellant was able to identify relevant witnesses and to interview them. Appellant argues

that the court orders were ineffective because guards individually chose whether to testify

and, regardless, Vigen and Woods had "to promise the [corrections officers] that they will

not come and testify in order to get any cooperation from 'em at all." But after reviewing

the record, we cannot find support for Appellant's claim that he had to promise to not

subpoena corrections officers.[18]

Moreover, as the State correctly notes, at least one corrections officer who gave

favorable information to the defense was called to the stand by the State, and Appellant's

---

[18]On direct examination, Vigen explained that he procured an order from the trial court so he and Woods could interview TDC employees and records. Then, on cross-examination, Vigen explained the process in detail:

> [VIGEN]: We asked the Court for permission to interview corrections officers. We then asked the general counsel for [TDC] whether we could interview them. He gave permission. And then we asked the warden for her permission.
>     So I didn't approach any officers at all, on my own. I asked the warden and the prison administration to ask officers if they would be willing to tell me about [Appellant], if they knew about him.
>     So I didn't feel -- I thought it was an intrusion on my part to go and solicit officers. I thought it would be better if the warden and her staff made the request. And then anyone that wanted to be interviewed or knew him was willing on their own to come, then I would interview them. But I didn't want to be in a position of button-holing or pressuring or putting officers in uncomfortable situations. I wanted them to freely be able to come and feel no pressure to talk with me.

At a later sub rosa hearing, Woods testified that the trial court had granted an order allowing him and Vigen access to personnel records of the prison. He also explained that he contacted the general counsel of the agency and visited with a lawyer to determine if the agency would have an objection to the order. Finally, he testified that once he conversed with them, the agency's attorney would issue instructions to the staff as to how much cooperation should be given and what access they should be allowed.

cross-examination of that officer was limited to confirming that he remembered speaking with Vigen and Woods. Although Appellant complains that officers subpoenaed by the defense would have retaliated by saying bad things about Appellant, that does not explain why the defense chose not to cross-examine a witness called by the State, who had previously made statements that would have helped the defense.

Therefore, we cannot say that his right to present an effective defense as it pertains to his right of compulsory process was violated. Because Appellant did not subpoena witnesses who refused to appear in court voluntarily, he never exercised that right. Points of error twenty-seven and twenty-eight are overruled.

## X. Future dangerousness

In point of error twenty-nine, Appellant argues that there was legally insufficient evidence to support the jury's "yes" answer to the future-dangerousness special issue. Specifically, he emphasizes that he had no violent incidents while incarcerated for thirty-two years, and he claims that he is too ill to be physically violent.

We review a legal-sufficiency challenge to the jury's finding of future dangerousness in the light most favorable to the jury's finding. *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). The relevant inquiry is whether, based on the evidence and reasonable inferences therefrom, any rational trier of fact could have found beyond a reasonable doubt that Appellant would be a future danger. *See Berry v. State*, 233 S.W.3d 847, 860 (Tex. Crim. App. 2007). In *Keeton*, we held that a jury is permitted

to consider a range of factors when determining future dangerousness:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;
2. the calculated nature of the defendant's acts;
3. the forethought and deliberateness exhibited by the crime's execution;
4. the existence of a prior criminal record, and the severity of the prior crimes;
5. the defendant's age and personal circumstances at the time of the offense;
6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;
7. psychiatric evidence; and
8. character evidence.

*Keeton*, 724 S.W.2d at 61.

The circumstances of the crime may be sufficient to support a "yes" answer to the future-dangerousness special issue. *De Voe v. State*, 354 S.W.3d 457, 463 (Tex. Crim. App. 2011). We have rejected arguments that a person's advanced age at the time of sentencing prevents the jury from finding that a defendant is a future danger. *See Coble*, 330 S.W.3d at 266-67. The issue is not whether a defendant can be controlled in prison, but "whether a defendant would constitute a continuing threat 'whether in or out of prison . . . .'" *Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Crim. App. 2010).

The evidence presented at punishment showed that Appellant verbally and physically abused his wife and infant daughter. On January 20, 1977, Appellant committed the aggravated kidnapping of Vivian Lester with the intent to commit sexual abuse. That same year, he also raped Betty Parent Friedrichsen and committed the aggravated rape of Elizabeth Kegg. In 1978, Appellant pled guilty to two of the attacks

(one count of aggravated rape and one count of aggravated kidnaping with intent to commit sexual assault) in exchange for concurrent twenty-five-year sentences. Appellant was paroled six months later. His criminal and sexually deviant behavior continued when the instant offense occurred and he sexually assaulted Samota. This time, however, his actions escalated as he murdered the victim by stabbing her eighteen times. Then eight months after Samota's murder, Appellant sexually assaulted another woman. A jury convicted him and sentenced him to life in prison and a $10,000 fine.

Evidence also showed that Appellant had spent 32 years of his life in the Texas Department of Criminal Justice at the time of trial. While incarcerated Appellant committed twenty-nine infractions, many involving abusive behavior toward female guards. Testimony also showed that Appellant was arrogant and defiant in prison.

In short, overwhelming evidence was presented that Appellant was a violent predator who was willing to use deadly weapons while sexually assaulting women. The evidence also showed that Appellant's criminal activities were becoming more violent and that his hostility towards women has never ceased. On this record, a rational jury could have found that there is a probability that Appellant would be a continuing threat to society. Point of error twenty-nine is overruled.

## XI. Evidence of demeanor

In point of error thirty, Appellant argues that the trial court should have granted a mistrial when the State's witness at punishment, Detective Linda Crum, testified that

Appellant showed no remorse when she interviewed him in 2008. Appellant asserts that Crum's testimony violated his Fifth Amendment right against self-incrimination because it was a comment on his failure to testify.

Appellant's complaint stems from Crum's testimony and the admission at punishment of State's Exhibit No. 88, a statement made by Appellant in 2008 concerning his whereabouts at the time of the murder. The exhibit was admitted over Appellant's objection. Crum read the statement and continued her testimony:

> [STATE]: And when you talked to him that day about this, did he show any remorse, whatsoever?
>
> [CRUM]: None, whatsoever.
>
> [DEFENSE]: I'm going to object to that, Your Honor. That violates the Fifth Amendment.
>
> [COURT]: Sustained.
>
> [DEFENSE]: Ask the jury be instructed to disregard that statements.
>
> [COURT]: The jury will disregard the last statement from the witness.
>
> [DEFENSE]: Unfortunately, we have to move for a mistrial to reserve our position.
>
> [COURT]: Denied.  Proceed.

Crum went on to testify that initially Appellant was "arrogant" but his demeanor changed "dramatically" when he was told the date of Samota's murder. Crum explained, "He became more visibly aware . . . he changed his demeanor from being arrogant to being more forward."

The Fifth Amendment of the United States Constitution prohibits a person from being compelled to be a witness against himself in a criminal case. U.S. CONST. amend V; *see also* TEX. CODE CRIM. PRO. art. 38.08. This amendment prevents comments by counsel or the trial court that allude to a defendant's choice to not testify, including references to his failure to exhibit remorse. *See Howard v. State*, 153 S.W.3d 382, 385-86 (Tex. Crim. App. 2004) ("[A] prosecutor's comment on a defendant's failure to show remorse is tantamount to a comment on his failure to testify.").

This Court has addressed whether statements by the prosecution or the trial court have violated a defendant's right to remain silent when they alluded to his failure to testify. *See Davis v. State*, 782 S.W.2d 211, 222-23 (Tex. Crim. App. 1989). To determine whether the comment in question violated a defendant's right to remain silent, the language used, when viewed from the jury's standpoint, must have been "manifestly intended or of such a character that the jury would necessarily and naturally take it as a comment on the accused's failure to testify." *Banks v. State*, 643 S.W.2d 129, 134 (Tex. Crim. App. 1982). "It is not sufficient that the language might be construed as an implied or indirect allusion." *Id.* When the remark directs the attention of the jury to an absence of evidence that could be supplied only by the defendant, that remark is a comment on the defendant's right to remain silent and is reversible error. *Id.* at 134-35. But if the remark is a reference to a defendant's failure to produce evidence other than his own testimony or if it is a reference to other record evidence, we have held that such a remark is proper.

*Howard,* 153 S.W.3d at 385-86; *Banks*, 643 S.W.2d at 135.

On appeal, we review the denial of a mistrial for an abuse of discretion. *See Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007). The State's question to Crum about Appellant's lack of remorse was not an improper comment on Appellant's failure to testify. Crum's testimony described Appellant's demeanor in 2008 when DNA evidence had connected him to the crime scene, but he had not admitted to the murder. There is no connection between Appellant's expression at that time and his failure to testify at trial two years later. Moreover, even if it were error, the trial court promptly instructed the jury to disregard the comment. As we have stated, "the . . . presumption that an instruction [to disregard] generally will not cure comment on failure of the accused to testify . . . has been eroded to the point that it applies only to the most blatant examples. Otherwise, the Court has tended to find the instruction to have force." *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995) (bracketed material and ellipses in original) (quoting *Waldo v. State*, 746 S.W.2d 750, 753 (Tex. Crim. App. 1988)); *see Moore v. State*, 999 S.W.2d 385, 405 (Tex. Crim. App. 1999). The State's question was limited in context to Appellant behavior during the 2008 interview with Crum, and the concept of remorse was not mentioned again. We assume that the curative instruction had force, and any error was cured. *See Dinkins*, 894 S.W.2d at 356.

Therefore, even if the State's question was erroneous, it did not affect the verdict. The trial court did not abuse its discretion when it denied Appellant's motion for a

mistrial. Point of error thirty is overruled.

## XII. Admissibility of prior convictions

In point of error thirty-one, Appellant argues that, at punishment, the State impermissibly introduced evidence of prior convictions of a character witness for Appellant, Johnnie Lindsey. Citing Texas Rule of Evidence 609, Appellant argues that Lindsey's convictions should not have been admissible for impeachment purposes because they were too remote and any probative value was substantially outweighed by the prejudicial effect. *See* Tex. R. Evid. 609(a).

Generally, Texas Rule of Evidence 609 bars impeachment of a witness with prior convictions if a period of more than ten years has passed since the date of the witness's conviction or the date of his release from prison, whichever is later, unless the court determines, in the interest of justice, that the probative value of the prior convictions, supported by specific facts and circumstances, substantially outweighs its prejudicial effect. *Id.* at (b).

Still, we have held that otherwise inadmissible prior convictions can be admitted when a witness, during direct examination, leaves a false impression as to his prior arrests, convictions, charges, or incidents with the police. *See Prescott v. State*, 744 S.W.2d 128, 131 (Tex. Crim. App. 1988). "Where the witness creates a false impression . . . , he 'opens the door' on his otherwise irrelevant past criminal history and opposing counsel may expose the falsehood." *Delk v. State*, 855 S.W.2d 700, 704 (Tex. Crim. App.

1993). It is not enough for a witness to imply that he is a law-abiding citizen—to open the door the witness must convey the impression that he has never committed a crime (or in this case, another crime). *See, e.g.*, *Trippell v. State*, 535 S.W.2d 178, 179 (Tex. Crim. App. 1992); *Orozco v. State*, 164 Tex. Crim. 630, 632, 301 S.W.2d 634, 635 (Tex. Crim. App. 1957). We will uphold the trial court's ruling if it was within the zone of reasonable disagreement. *See Theus v. State*, 845 S.W.2d 874, 881 (Tex. Crim. App. 1992).

At trial, Appellant wanted to introduce evidence that Lindsey had been exonerated for the crime of aggravated rape to show "how he got out of prison" and to bolster his credibility. The State objected to the admission of that testimony on the grounds that it was irrelevant and that it would leave a false impression with the jury that Lindsey was a law-abiding citizen, even though he had prior (stale) convictions for larceny, aggravated robbery, and attempted rape. The State further argued that, upon admission of Lindsey's status as an exoneree, the door to his prior criminal history would be opened, and it could then elicit testimony regarding his prior convictions to rebut that false impression. The trial court agreed. The court ruled that the defense could present the exoneration evidence, but it also ruled that if the defense chose to do so, the door to Lindsey's prior convictions would also be opened. The court said that because the jury had already heard that Lindsey was in prison and was exonerated, it was entitled to presume that Lindsey was a convicted felon. Accordingly, when the defense elicited testimony from Lindsey that he was pardoned, the State was allowed to elicit testimony regarding his three prior

stale convictions, and the trial court overruled Appellant's objections to the admission of those prior convictions.

The following relevant exchange took place:

[DEFENSE]: You said you grew up in Dallas. But there was a time when you were actually in prison; is that right?

[LINDSEY]: Yes, sir.

[DEFENSE]: Okay. There was a time recently when you were released from prison; is that correct?

[LINDSEY]: Yes, sir.

. . .

[DEFENSE]: Okay. 2008, September 19th, you were release[d] from the prison and you were released on a pardon for actual innocence; is that correct?

[LINDSEY]: Yes, sir.

The trial court did not abuse its discretion in allowing the State to introduce evidence of Lindsey's three prior convictions following this exchange. *See Theus*, 845 S.W.2d at 881. This exchange could have misled the jury regarding Lindsey's criminal history because the questions and answers suggest that Lindsey had been incarcerated just one ("a") time and that had been for an alleged offense of which he was actually innocent. Such an impression contrasts with the reality of Lindsey's three prior felony convictions. Thus, the defense opened the door to Lindsey's prior convictions when its questioning resulted in the false impression. *See Prescott*, 744 S.W.2d at 131. We overrule

Appellant's thirty-first point of error.

### XIII. Authentication of penitentiary packet

In point of error thirty-two, Appellant complains that the trial court should not have admitted the penitentiary packet offered by the State because the accompanying certification was deficient in that it was not executed by the Director of TDCJ or someone else who is designated to receive those documents under Article 42.09, Section 8(b) of the Texas Code of Criminal Procedure.

To resolve this issue, we need not address whether the statutory requirements under Article 42.09, Section 8(b), were fulfilled because the penitentiary packet was properly authenticated under Rule 901 of the Texas Rules of Evidence. *See Reed v. State*, 811 S.W.2d 582, 587-88 (Tex. Crim. App. 1991) (op. on reh'g). Under Rule 901, a document is authenticated for purposes of admissibility if there is sufficient evidence "to support a finding that the matter in question is what the proponent claims." Tex. R. Evid. 901(a). In other words, "the requirement of authentication is satisfied by extrinsic evidence that the matter in question is what its proponent claims." *Reed*, 811 S.W.2d at 587. In *Reed*, we held that the penitentiary packet was properly authenticated under Rule 901 because the records were correct copies upon which TDCJ relied in admitting inmates. Additionally, the testimony of a State's fingerprint expert confirmed that fingerprints in the penitentiary packet matched those of the appellant. *Id.* at 587-88.

In this case, as in *Reed*, the certified documents tendered by the State are copies of

the original documents as per the affidavit signed by the records clerk of TDCJ. Also, the State called a fingerprint expert witness to testify that the fingerprints in the penitentiary packet matched those of Appellant. We overrule Appellant's point of error thirty-two.

### XIV. Admissibility of Officer Masterson's testimony

In points of error thirty-three and thirty-seven, Appellant complains that two portions of Houston Police Officer Ronald Masterson's testimony at the punishment phase should have been excluded because they were hearsay. Masterson testified that he received a call in 1977 regarding aggravated kidnaping with intent to commit sexual assault. Masterson testified that the victim, Vivian Lester,[19] was hysterical but provided a description of the suspect and the car that he was driving. Subsequently, Appellant pled guilty to the crime and received a 25-year sentence. Appellant argues that Masterson's testimony regarding Lester's out-of-court statements describing Appellant and his vehicle should have been excluded because both statements were made by an out-of-court declarant and were offered for the truth of the matter asserted (*i.e.*, that Appellant was Lester's attacker). *See* Tex. R. Evid. 801(d).

The State did not offer Lester's description of Appellant and his vehicle for the truth of the matter asserted. That fact had already been established by proof of Appellant's conviction for the offense through admission of the penitentiary packet.

---

[19]Throughout the trial record, this person is variously referred to as Vivian Lesser and Vivian Lester. We refer to her as Vivian Lester.

Lester's description was simply offered to show how the investigation progressed and Appellant became a suspect for the crime. Points of error thirty-three and thirty-seven are overruled.

### XV. Denial of Appellant's motion for mistrial

In point of error thirty-four, Appellant complains that the trial court erroneously denied his motion for mistrial "when the prosecution asked prejudicial questions of a defense witness in the punishment stage of the trial." Appellant complains about questions posed to defense expert Dr. Vigen regarding a letter written by inmate Henry Aguilar to prison officials. Appellant supports his argument with the following exchange, arguing that the State lacked a good-faith basis for the question:

> Q [THE STATE]. Doctor, I believe you told the jury before lunch that you were familiar with the threat that Donald Bess made against Henry Aguilar here in Dallas County jail a couple months ago, correct?
>
> A [VIGEN]. I just read the report. That's all I know about it.
>
> Q. Okay. Did you read the letter regarding where Donald Bess had told Aguilar that he had forced Angela Samota - - forced her to have sex and then "stabbed the bitch"? Did you read that?
>
> A. I did not read a letter like that, no.
>
> [DEFENSE]: Objection, Your Honor. There's no letter from Donald Bess to that. That is absolutely ridiculous.
>
> THE COURT: The witness has denied the question.
>
> [DEFENSE]: It's a prejudicial question, designed to prejudice him about something like that. That's totally improper.

THE COURT: The State needs to show us a good-faith basis for asking questions like that.

[THE STATE]: Judge, clearly, he's giving these opinions. I have the ability to ask him if he used that and whether that would have changed his opinion about it. And we've turned these things over. I thought the Doctor had looked at everything.

THE COURT: Well, you're entitled to ask him if he knows about such a letter. But you're not entitled to read from it.

At trial, Appellant objected to the question about the letter, claiming that no such letter existed and that the question was prejudicial and asked in bad faith. The State responded that it had a good-faith basis for its question, and that, before trial, it had turned over the letter in question to the defense. At the pretrial hearing, defense counsel acknowledged that he had a copy of the letter. Additionally, the State argues that it was entitled to ask whether Vigen was aware of the letter and, if he was not, whether the letter would have changed his opinion. The trial court sustained Appellant's objection and gave a curative jury instruction to disregard the State's comment. Appellant moved for a mistrial, and the trial court overruled that motion.

"A mistrial is an appropriate remedy in 'extreme circumstances' for a narrow class of highly prejudicial and incurable errors." *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). Because of the remedy's extreme nature, a mistrial "should be granted only when residual prejudice remains after objections are sustained and curative instructions given." *Barnett v. State*, 161 S.W.3d 128, 134 (Tex. Crim. App. 2005); *see also Ocon*, 284 S.W.3d at 884-85. An appellate court reviews a trial court's denial of a

mistrial for an abuse of discretion, so the ruling must be upheld if it was within the zone of reasonable disagreement. *Ocon*, 284 S.W.3d at 884. We consider the trial court's ruling in light of the arguments that were before the trial court at the time of its ruling. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004).

On appeal, Appellant argues that the State did not show a good faith basis for the prejudicial question and that **"[t]he State's argument was a blatant attempt to invite the jury to speculate on whether or not [Appellant] attempted to flee as would a guilty person."** The quoted exchange does not even allude to an attempt by Appellant to flee. Thus the objection at trial does not comport with the one raised on appeal. *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App.2009).

Even if the exchange was problematic, the trial court promptly instructed the jury to disregard the statement. Generally, an instruction to disregard an improper question is sufficient to render it harmless. *See Hernandez v. State*, 805 S.W.2d 409, 413-14 (Tex. Crim. App. 1990) (stating that in most cases, any harm from an improper question may be cured by an instruction to disregard that question). And where the immediate complaint focuses on matters not even included in the quoted exchange, we cannot find an abuse of discretion on the part of the trial court in denying the motion for mistrial. Additionally, defense counsel told the trial court that no such letter from Bess existed when the record contains the letter, which speaks for itself, and counsel conceded at a pre-trial hearing that

he had a copy of the letter.[20]

Finding no abuse of discretion, point of error thirty-four is overruled.

## XVI. Closing arguments

In points of error thirty-five, thirty-six, thirty-eight, and thirty-nine, Appellant complains that the trial court erred when it overruled his objection to a portion of the State's closing argument because those improper arguments denied him due process of law. Appellant's points of error can be broken into two categories: (1) complaints about comments pertaining to parole, and (2) arguments that Appellant chose to undergo an elective surgical procedure and purposely failed to take his medication to delay his trial.

As discussed previously (*see* VIII. Jury arguments), proper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answer to an argument of opposing counsel, and (4) pleas for law enforcement. *See Freeman*, 340 S.W.3d at 727 (citing *Brown*, 270 S.W.3d at 570).

### A. Comments about parole

Appellant contends that the State improperly referred to parole eligibility and those references prejudiced him. *See Taylor v. State*, 233 S.W.3d 356 (Tex. Crim. App. 2007). He cites the following excerpt from closing arguments at the punishment phase:

> [PROSECUTOR]: But for [Vigen] to come in and talk about our prison
> system and the prison system can control the likes of [Appellant], without

---

[20]During a pretrial suppression hearing, Aguilar and a gang-intelligence sergeant who was familiar with both Appellant and Aguilar attested to the letter, and the State introduced the letter as Exhibit A.

> telling you the incentive, giving you a reason maybe why, as he characterized them, these 29 violations are minor and they're no big deal. Again, that incentive is the possibility of getting out.

After this comment, Appellant objected, and the trial court overruled that objection.

A prosecutor should avoid applying the parole law specifically to the defendant on trial. *Clark v. State*, 643 S.W.2d 723, 724 (Tex. Crim. App. 1982) ("The evil to be avoided is the consideration by the jury of parole in assessing punishment."). But the jury argument here was not an improper comment on parole. Instead, the State's argument was a proper summation of and a reasonable deduction from the evidence, and it did not improperly imply parole eligibility for the instant offense. When Appellant objected, the State's argument focused on a critique of Vigen's conclusion that Appellant would not be a future danger. In this context, rather than referencing the possibility of parole for the instant crime, the State's argument was an attempt to discount Vigen's conclusion on the ground that he failed to consider that Appellant's disciplinary violations in prison had not been more egregious because he was hoping to obtain parole on the life sentence that he was already serving for another sexual assault. The State based this argument on record evidence, including the fact that Appellant was on parole when he committed the instant capital murder and that he was working to obtain parole on the extraneous 1985 sexual assault when he became a suspect in the instant capital murder.

Because the State's argument was a proper summation of the evidence and asked the jury to make reasonable deductions from the evidence, point of error thirty-five is

overruled. *See Freeman*, 340 S.W.3d at 727. Furthermore, because we find no error in the State's closing argument, Appellant's due process rights were not violated, and we overrule point of error thirty-six.

### B. Comments about elective surgery and medication

One mitigation issue raised at closing arguments was Appellant's deteriorating health. Appellant complains that the State argued outside of the record when it suggested that Appellant chose to undergo elective surgery to delay his trial. He also objects to the State's argument that he intentionally failed to take his anticoagulant medication to cause complications and to delay his trial.

Appellant had a cardiac condition that required the installation of a stent to open one of his arteries due to plaque buildup. Years later, when Appellant was taken to the hospital complaining of new chest pains, two additional arteries were seventy-five percent blocked. One of Appellant's doctors, Dr. Das, testified that, because of Appellant's fragile cardiac condition, performing another cardiac catheterization carried high risks, including heart attack or stroke during the procedure. But not undergoing the procedure would also carry substantial risks. Appellant ultimately chose to have the elective surgery.

Two days after surgery, Appellant was taken back to the hospital, again complaining of chest pains. Dr. Das testified that Appellant's two new stents had clotted. He explained that clotting after the insertion of stents was a "very uncommon to rare complication." Das stated that he had prescribed Plavix, an anticoagulant, for Appellant

to prevent his platelets from clotting and that Appellant was fully capable of self-administering his drugs. However, he had no way of knowing whether Appellant had taken his medication after he was released from the hospital. In his opinion, "If [Appellant] didn't take it, that would have put him somewhat at risk of [clotting] in the stents."

The State's argument that Appellant's procedure was elective was proper because it was firmly rooted in the record. Testimony supported that without the procedure, Appellant's blocked arteries could collapse, but there were substantial risks associated with the surgery as well. Thus, there were serious risks associated with either decision, and the choice to undergo the procedure was Appellant's—the definition of an elective surgery. *See* WEBSTER'S II: NEW COLLEGE DICTIONARY 362 (1999) (defining "elective," in part, as "[p]ermitting or involving a choice").

However, the State's argument asking the jury to infer that Appellant intentionally failed to take his medication was improper. That argument is outside of the record because Das testified that he had no way of knowing if Appellant took his prescription drugs after being released from the hospital, and no other witness testified with that knowledge. Evidence revealing that Appellant possessed his medication and failed to take it was not introduced into the record until Appellant filed a motion for new trial.

Nonetheless, this improper jury argument does not warrant reversal because the error did not affect Appellant's substantial rights. *See Martinez v. State*, 17 S.W.3d 677,

692-93 (Tex. Crim. App. 2000) (applying the nonconstitutional error standard to improper jury argument outside of the record); *see also* Tex. R. App. P. 44.2(b). We determine whether a defendant's substantial rights were affected by weighing the severity of the misconduct, any curative measures, and the certainty of the assessed punishment. *See Martinez*, 17 S.W.3d at 692-93. We also consider the jury argument in light of the record to determine if the argument was extreme or manifestly improper. *See Brown*, 270 S.W.3d at 570 (citing *Allridge*, 762 S.W.2d at 155).

The State's argument in this case was harmless. The trial court, on its own motion, gave a curative instruction, and when viewing the argument in light of the entire record, it is not so prejudicial that the trial judge's prompt admonishments did not cure any error. *See Long v. State*, 823 S.W.2d 259, 267 (Tex. Crim. App. 1991). Appellant's points of error thirty-eight and thirty-nine are overruled.

### XVII. Mitigation Issues

In point of error forty, Appellant argues that he was denied due process of law because, on appeal, this Court does not review a jury's answer to the mitigation issue. In point of error forty-one, he argues that the jury's answer to the mitigation issue is against the great weight of the evidence. Although Appellant asserts that the failure to review such jury answers violates his constitutional and statutory rights, Appellant does not identify any specific provision, statutory or otherwise. In addition, Appellant presents no new arguments warranting a change in the law. We do not review the sufficiency of the

evidence to support the jury's answer to the mitigating issue, and Appellant's due process

rights were not violated in the current law. *See Estrada*, 313 S.W.3d at 311 (citing

*Rousseau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005)). We overrule

Appellant's points of error forty and forty-one.

In points of error forty-two and forty-three Appellant complains that the Texas

death-penalty scheme is unconstitutional under United States Supreme Court precedent

because the mitigation special issue is "nothing more than a nullification issue . . . ."

Appellant does not cite any authority or to argue why the mitigation instruction in his case

had the same affect as the nullification instruction at issue in *Smith v. Texas*, 543 U.S. 37

(2004). We nonetheless address his point of error.

The mitigation instruction used by the trial court in Appellant's case asked,

> Do you find, taking into consideration all of the evidence, including the
> circumstances of the offense, the Defendant's character and background,
> and the personal and moral culpability of the Defendant, Donald Andrew
> Bess, Jr., that there is a sufficient mitigating circumstance or circumstances
> to warrant that a sentence of life imprisonment rather than a death sentence
> be imposed?

If the jury reached the third special issue and answered it "yes," then Appellant would

have been sentenced to life in prison.

The nullification instruction in *Smith* told the jury to consider all mitigating

evidence and that,

> In answering the Special Issues submitted to you herein, if you believe that
> the State has proved beyond a reasonable doubt that the answers to the
> Special Issues are "Yes," and you also believe from the mitigating evidence,

> if any, that the Defendant should not be sentenced to death, then you shall answer at least one of the Special Issues "No" in order to give effect to your belief that the death penalty should not be imposed due to the mitigating evidence presented to you. . . .

*Smith*, 543 U.S. at 40-41. The Supreme Court held that this instruction was constitutionally inadequate because the "jury was essentially instructed to return a false answer to a special issue in order to avoid a death sentence." *Id.* at 48 (quoting *Penry v. Johnson*, 532 U.S. 782 (2001)). The instruction resulted in an ethical dilemma for jurors as they had to choose between answering the special issues truthfully or having to answer one of them untruthfully if it found sufficient mitigating evidence.

In contrast to *Smith*, the jury in this case was not required to return a false answer to a special issue to avoid sentencing Appellant to death. The jury instructions in this case did not prevent the jury from giving meaningful consideration and effect to any mitigating evidence. Appellant's points of error forty-two and forty-three are overruled.

## XVIII. Federal issues

In point of error forty-four, Appellant argues that his federal right to due process and equal protection, and his rights under Article I, Sections 13 and 19, of the Texas Constitution were violated. Appellant argues that, because Texas has two-hundred fifty-four counties, the ability of each prosecutor to make an individualized decision of whether to pursue the death penalty violates the Supreme Court's holding in *Bush v. Gore*, 531 U.S. 98 (2000). Appellant asserts that *Bush* stands for the proposition that "[w]hen a court orders a statewide remedy, there must be at least some assurance that the

rudimentary requirements of equal treatment and fundamental fairness are satisfied." We have previously addressed identical arguments and rejected them, and Appellant presents no new law or argument that persuades us to revisit this issue. *See Roberts v. State*, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007). Point of error forty-four is overruled.

In point of error forty-five, Appellant argues that, under *Furman v. Georgia*, 408 U.S. 238 (1972), the Texas death-penalty scheme allows unrestrained discretion to assess death because the mitigation special issue is fatally flawed. In points of error forty-six and forty-seven, Appellant argues that his death sentence is unconstitutional because the mitigation instruction "sends mixed signals" in violation of *Penry v. Johnson*, 532 U.S. 782 (2001) and the Texas Constitution. In point of error forty-eight, Appellant asserts that the "10-12" rule is unconstitutional, and in point of error forty-nine, Appellant contends that, because undefined terms are used in the jury instructions during the punishment phase, imposition of the death penalty in his case would be unconstitutional. In points of error fifty and fifty-one, Appellant argues that his rights under federal and state law were violated because the jury had unlimited discretion to consider mitigating evidence, but the jury was restricted in its discretion to impose the death penalty. In point of error fifty-two, Appellant contends that the statutory mitigation instruction is unconstitutional because it fails to place a burden of proof on the State.

We have consistently rejected all of Appellant's arguments in points of error forty-five through fifty-two, and because Appellant presents this Court with no new arguments

or points of law, we overrule those points of error. *See Williams*, 301 S.W.3d at 694;

*Saldano*, 232 S.W.3d at 107-08; *Coble*, 330 S.W.3d at 296-97; *Bell v. State*, 938 S.W.2d

35, 53-54 (Tex. Crim. App. 1996).

We affirm the judgment of the trial court.

Delivered: March 6, 2013

Do Not Publish